No. 39,508

TERESA LINDBLOOM, *Appellant,* v. GERALD B. LINDBLOOM, *Appellee.*

(279 P. 2d 243)

Opinion filed January 22, 1955.

*Keith Martin,* of Mission, argued the cause, and *Thomas Sullivan,* of Kansas City, Missouri, was with him on the briefs for the appellant.

*Herbert L. Lodge,* of Olathe, was on the briefs for the appellee.

The opinion of the court was delivered by

HARVEY, C. J.: On September 10, 1953, plaintiff filed her petition for separate maintenance. The defendants were her husband and his parents. Hereafter when we speak of defendant we mean plaintiff's husband, and when we speak of his parents we will identify them. In plaintiff's petition she alleged that she married the defendant, Gerald B. Lindbloom, July 19, 1947; that they are the parents of three children: Rachel, age 3; Kristine, age 2; and Karen, age 1; that she had performed her duties as the wife of defendant; that the defendant had been guilty of extreme cruelty and gross neglect of duty; that prior to the filing of the petition she was ill and defendant had the care of the children; that she is presently able to care for them but that defendant refuses to let her have the care, custody and control. That she believes the children are presently residing with Con Lindbloom and Mary Lindbloom, parents of the defendant, of Osage City, Kansas. The petition alleged other facts not necessary to state here. The prayer was that she be granted the custody of the children, separate maintenance for herself and children, and that the court make other proper orders. On the same day she filed a motion for an order granting her the custody of the minor children pending the action, and for temporary support money and attorneys fees.

To this petition defendant filed a motion to dismiss and abate upon the grounds that prior to the time this action was brought defendant filed in the district court of Osage County a petition against plaintiff for a divorce and a determination of the custody of the children and the rights of the parties, which action was still pending.

These motions were heard by the court on October 9, 1953. Defendant's motion to dismiss and abate was denied. The court denied plaintiff's motion for temporary custody of the children but did arrange for her to visit them, and made an order for defendant to pay plaintiff a stated sum for temporary alimony and also a sum to apply upon her attorneys fees, and fixed the times for such payments.

To this petition defendant filed an answer and cross-petition. In the answer he denied the material allegations to the petition, except as admitted. The answer specifically admitted the marriage of the parties; that they are the parents of the three minor children named in the petition; and other facts no longer in controversy. In the cross-petition defendant alleged that during their married life he had demeaned himself as the husband of plaintiff but that plaintiff had been guilty of extreme cruelty and gross neglect of duty. Defendant further alleged that plaintiff was not a fit and proper person to have the care, custody and control of the three minor children, but the defendant was a fit and proper person to have such custody. The prayer was that plaintiff take nothing by her petition; that defendant be granted a divorce upon his cross-petition; that he be awarded the care, custody and control of the minor children; and that the court determine and decree an equitable division of the property rights of the parties.

In reply to the cross-petition plaintiff denied she had been guilty of extreme cruelty and gross neglect of duty; denied that she was not a fit and proper person to have the care and custody of the minor children, and asked relief in harmony with the prayer of her petition.

On February 19, 1954, the parties appeared before the court and offered testimony and the court took the same under advisement until March 1, 1954. At that time the court found that the allegations contained in plaintiff's petition were not sustained by the evidence, and that plaintiff was not entitled to the relief prayed for. The court further found the allegations contained in defendant's cross-petition were true and that defendant was entitled to be divorced from plaintiff upon the grounds of gross neglect of duty. The court further found plaintiff not a fit and proper person to have the care, custody and control of the minor children, and that defendant was a fit and proper person to have such custody. The court made a division of the property of the parties and fixed the final fee for plaintiff's attorneys. Judgment was entered in accordance with these findings.

Plaintiff filed a timely motion for a new trial upon the grounds that the judgment of the court was not supported by the evidence. This motion was considered and denied, and the court fixed a definite period for plaintiff to have the children with her, or to visit them.

On March 9, 1954, plaintiff filed a motion of her intention to

appeal from the order granting the divorce and other orders adverse to her made by the court. Notice of appeal was duly served and filed on March 16, 1954.

The evidence may be summarized as follows: Plaintiff and defendant were married in Los Angeles, California, on July 19, 1947; prior to their marriage plaintiff had lived with her parents who resided in Kansas City, Missouri, and had worked for seven years for the Hall Brothers Greeting Cards in Kansas City; defendant was a Navy career man. At the trial in December, 1953, he testified he had been in the Navy more than twelve years and that further service of less than eight years would permit him to retire. The circumstances of their meeting and becoming acquainted is not disclosed. Soon after their marriage defendant went to Japan. In December, 1948, plaintiff went to Japan on a transport ship to join her husband. In route she had a miscarriage at which time she was about six months with child. She remained in Japan until March, 1951, and while there two children were born to the parties: Rachel, on November 16, 1949, and Kristine on January 15, 1951. In March, 1951, plaintiff and the two children returned to Kansas City; defendant stayed with the naval service in Japan. Upon her return to the states plaintiff and her children lived, for a short time, with her parents in Kansas City and then rented an apartment. Plaintiff and the children later went to the home of defendant's parents in Osage City; defendant's mother noticed some strange conduct on the part of plaintiff and notified plaintiff's parents to come and get her, which they did. Plaintiff's parents got her admitted to the General Hospital in Kansas City where she remained about six weeks, and was given some shock treatments. After her release from the hospital she went back a few times for further treatment as an out-patient.

Sometime in the summer of 1951 defendant visited his family in Kansas City and returned to duty at San Diego, California. Later defendant's mother wrote him three letters. While the contents of these letters are not disclosed in the abstract, as the result of them defendant got a two-year humanitarian leave to come home and be with his wife and children. In December, 1951, the parties moved into a farm home not far from Olathe. About July 1, 1952, they contracted to purchase a residence in Olathe and moved there. On August 24, 1952, the third child, Karen, was born. In December, 1952, defendant had plaintiff committed to Osawatomie State Hospital for observation and treatment. She stayed there about 90 days.

During this time defendant's mother kept the two older children and plaintiff's mother kept the baby. When plaintiff was released from the hospital in February, 1953, she stayed part of the time with her mother and part of the time with defendant's mother over a period of about five weeks, and went back to housekeeping in their home in Olathe. She remained there about two months and again went to defendant's parents' home in Osage City for about a month. Defendant again took her to Osawatomie State Hospital late in June, 1953. She was ready to leave there in about a month. On July 27, defendant went there for her and took her to the home of her parents in Kansas City without permitting her to see their children, then at the home of his parents in Osage City, and without stopping at their home in Olathe.

During the trial plaintiff was asked and answered the following question:

"Q. And what happened when he came to the hospital the last time to get you? A. Well, we no more than got into the car than he told me he was going to take me home to my mother's, and that his mother was going to raise the children. Of course, I was really surprised. I said, 'You can't do that. Those children are my children. They don't belong to your mother.' He said, 'Well, that is what he was going to do, he was going to take them to his mother to raise.'"

She was asked and answered the following questions about how she felt while at Osawatomie:

"Q. No, I am just asking you, in your opinion, were you mentally ill during all that period of time? A. Well, let me put it this way: I was just uneasy about it all the time. I just never felt right. When I found out the place I was, I was just really surprised about it, because I didn't dream that is what it was. But I don't know what you mean—

"Q. . . . Just a moment. When you found out the place that you were in, I take it—what place are you referring to? A. Osawatomie State Hospital."

"Q. And after that you never felt right? A. What I mean is, I just didn't feel easy about it.

"Q. But the period of time prior to going to the State Hospital, did you have any uneasy feeling during that period of time? A. Well, the only thing that I can think of is I got tired, naturally, after doing a day's work with children, and that is about all I can realize, just put my finger on."

After defendant had taken plaintiff home on July 27, her mother and sister Margaret went to see defendant at the Olathe Air Base where he was working. Margaret testified as follows:

"Q. And tell us the gist of that discussion or conversation with the defendant. A. Well, we asked him if we could go get the children and he said no. Then we asked him what the doctor had said when he left the hospital and he said that the doctor recommended that she should have the children, but we

couldn't get them. So I asked him several times what his plans were and he didn't answer.

"Q. Was anything said about Teresa and the defendant resuming housekeeping? A. Yes. She said, 'You mean I am never going to be able to go back and keep house.' And he said, 'No, I had a sample of your housekeeping last spring.'

"Mr. Lodge: (Defendant's counsel) Repeat That.

"The Witness: He said, 'I had a sample of your housekeeping last spring.' "

None of this testimony was contradicted by the defendant.

Plaintiff's relatives, her parents, two sisters, and a few other persons who visited her frequently were called to testify for her. Their testimony, as a whole, may be summarized as follows:

Each time before plaintiff went to the hospital she was nervous and confused but after she returned she became normal again and was a very capable woman. Her parents and sisters testified that she would have a good home, and the father particularly testified that if the home proved not to be sufficient he was financially able to, and would, provide a better place for her. Plaintiff testified that she loved the children and would be very glad to have them.

Dr. DeMott, who examined her on October 30, 1953, testified as follows:

"I gave her a complete neurological examination and I failed to reveal any localizing organic disease of the central nervous system. I reviewed her history as best she could tell me, and what I gave her was a psychiatric interview and consultation, and my impression that on that date I felt that she was competent to take care of herself and children and to handle her own affairs on that date."

He also related that Mrs. Lindbloom had given him a history of neurological difficulties in the past.

Dr. DeMott further testified:

"Now, concerning these illnesses, this first one especially, she is a little vague about dates and what happened and how long she was there, which I feel is understandable and you could expect that in most cases that have been seriously ill in a psychiatric way. Now, her husband came back to the States on the basis of this illness. In August of '52, she had her third child, and I believe it was in the fall of '52 that they moved to Olathe. Now, in December of '52 she says she broke down again and was admitted to the State hospital at Osawatomie and remained there until about February of '53, and she received some electrical shock treatments at that time. She thinks she had about 12. Then she went back for an out-patient treatment for about two weeks. She states that she remembers little about the nature of that illness and that no doctor ever explained it to her. In the spring of '53 she slipped a little and her husband returned her to Osawatomie where she stayed

for about six weeks and was discharged on July 27 of '53. She received some more electrical shock therapy on that admission.  .  .  ."

He was asked:

"Q.  .  .  . as she described her husband's attitude, is there anything in that information that has a medical relevancy to the situation? A. Well, she feels that she noticed the change in her husband's attitude towards her after her first admission at Osawatomie. She felt that he was a little critical of her behavior and was observing her and watching to see if she was all right; and was himself irritable, and she felt that as he had been working very hard, she felt that he was maybe just a little nervous and irritable due to overwork. She also says that in '53 when she slipped a little that she didn't feel that she had slipped so much that she should have been readmitted down there, but she accepted it and on his recommendation, on her husband's recommendation. Now when he picked her up after this second admission, which I think was on July the 27th, '53, he told her to take—he had taken the children to his mother at Osage City, and was taking her back to her own mother, as he felt that she was bad for the children. Now, this was completely unexpected and she did say it was quite a shock to her, and also at that time her husband told her that she was not to see the children. However, she visited them twice. She said the last time was about two weeks before I saw her, and she states that on these visits the children were very happy to see her and would run and jump on her lap, and when she left, they wanted her to take them along with her, wanted to know why—."

On cross examination Dr. DeMott stated that electro shock treatments were given to patients whose illness affects the emotions and the moods. He did not have enough information to enable him to discuss her prognosis, as far as her future health was concerned. He also testified:

"I saw no indication for treatment at the time I saw her. (October 30, 1953.) I felt she was not suffering from any psychiatric condition."

While the case was pending plaintiff made her home with her parents and started selling Avon cosmetics to residents a few blocks away.

Defendant testified: That he had been in the Navy more than twelve years and that he would retire in less than eight; that when his wife returned to the United States in 1951, her transportation was furnished by the government; that he gave her $500 and three months later when he got home that money was gone and she had spent a $200 allotment check. Plaintiff advised him of the money he gave her, $200 or more of it was lost or stolen. At that time she was living in a 3-room second floor apartment which was not overly clean; the sink was loaded with dirty dishes, and he

knew something was wrong with her but he didn't know what it was. He went back into service and reported to his ship at San Diego. He had been there several months when his ship was operating out for about ten days. When he came back he found three letters from his mother; he went directly to his executive officer and told him that his wife was seriously ill and described it the way his mother had described it to him. He asked for an emergency leave, which was granted, and he came back to Kansas City. That was in September, 1951. He saw plaintiff at the General Hospital in Kansas City but did not see her doctor. After plaintiff's release from the hospital they moved into a farm home near the base about the 1st of December, 1951. After about seven months they purchased their home in Olathe for $9,250; that the present balance was $8,300; that for the first couple of weeks after the treatment at General Hospital plaintiff got along rather well but then he noticed a continuous downhill trend. That the children were living with them; they were not being cared for properly; their hair was straight; they weren't kept clean, the house work was not well done, and there was considerable waste of food and utilities. That when a dish of food was only partly consumed she would place it in the refrigerator, an old one given them by plaintiff's mother, and sometimes forget to use it before it spoiled; that sometimes milk was permitted to sour. That plaintiff became irritable and argumentative. That when the last child was born in August of 1952, plaintiff's aunt, Mary Travers, came to assist her for about a week when she came home from the hospital. He did not encourage her aunt to remain. He had cleaned the house thoroughly before she came home but she went around raging and screaming, taking spreads off the bed and couch, knocking over lamps and throwing magazines; sometimes she would slap the children. One evening she spanked one of the children.

He had her placed in the Osawatomie State Hospital. When she was released from Osawatomie he took her to the home of his parents for a week, and then to the home of her mother. That was her wish and the doctor's suggestion. They returned to their home in Olathe in the spring of 1953; there she seemed to be worse than when she got out of the General Hospital; had less patience with the children; the food waste and waste of utilities continued; the children were permitted to play with knives, bottles, scissors, pins, electric sewing machine, and to write on the wall with crayons,

and they weren't taught to put their toys away. Rachel got hold of a pair of scissors and clipped a big patch of hair out of her head; their winter clothes were not put away when warm weather came, and things of that nature. The children were allowed to carry sand in the house and in the garage and she was resentful of his efforts to procure medical treatment for her at Osawatomie and became somewhat difficult to handle. On one occasion she more or less argued with him all the way to the hospital but when she got to the doctor she straightened right up and he thought she was getting along wonderful.

In handling their finances, after they returned from Japan, he would give her money when something like a pair of shoes was definitely needed, he would let her choose the style and size of shoes but go along with her and pay for them. He did not regard her as being capable of handling the funds. One time when she told him she would like to have some money in the house for little things, he gave her a ten dollar bill, she got a neighbor to take her up town and she bought a cannister set, considerable yarn for knitting, embroidery, crayons for the children, and things of that nature, and spent all the money that afternoon. When they lived in Japan and when he was paid, they would lay aside enough money for definite bills and divide the remainder between them, sometimes that would amount to as much as $28.

Aside from what the defendant said, it does not appear that he gave her any money since their return to the states.

His testimony also disclosed that he did nothing himself to help her with the children or with her daily housework. When he came home in the evening he would take the waste basket out and burn the contents, and look after the garage; about every three weeks he would give the house a good cleaning. When they lived in Olathe he was working at the Navy Air Base and frequently worked nights—automatically every fifth night, sometimes he worked at the Chief's Club at night, and he was working for a neighbor who had a small contracting business. The waste of utilities still continued, the lights were on sometimes in the daytime and the children were permitted to flush the stool.

To what extent this waste of utilities increased the bills is not disclosed.

Defendant did not employ anyone to assist her in caring for the children and the housework.

His salary from the Navy was $316.19 per month, plus income from other work he did.

Since the case was started plaintiff had been to Olathe to see the defendant as many as four times. From his observations of her at those times and when she testified in court, his mind had not changed about her since he took her home.

He testified to an instance on October 11, 1953, when she visited the children at Osage City. His mother was in the kitchen and plaintiff went into the kitchen and went up to his mother with her fists drawn back and attempted to strike her. A different version of that was given by plaintiff in rebuttal to the effect that defendant's mother was not supposed to be at home that day; that defendant's attorney had told her attorney that she would not be there but when she (plaintiff) went into the kitchen and saw her she was excited and threw her arms up, but made no attempt to strike her.

Defendant's mother testified that she had visited plaintiff in Olathe twice; that the house was not well kept; the children were dirty; and on one occasion when plaintiff had taken Rachel into a barn, which defendant had told her not to let the children go into for there might be snakes in it, plaintiff imagined she saw snakes on Rachel. She testified the children were in better condition when she kept them.

Another witness called by defendant, who lived next door, testified the children were permitted to run in the neighbor's yard and the witness discouraged his children from playing with them; that on one occasion he saw the children playing outside in water when it was almost freezing.

Defendant's sister, who lived in Osage City, testified she visited plaintiff in Olathe in the spring of 1953, and also visited them when plaintiff and the children lived in Osage City; that the children were dirty and unkempt, and that plaintiff let the baby play in wet clothing.

Another witness, who lived two miles from the Lindbloom farm, testified that in June of 1953, when plaintiff and the children were living with defendant's parents the children were not clean and the baby needed changing and plaintiff objected to her changing the baby; that she visited the home later and the children looked healthier and were better behaved.

The evidence disclosed that defendant was paying his parents for the care of the children.

In this court counsel for appellant present three questions for our determination. They read:

"1. Was it error to grant the appellee a decree of divorce from his wife on the ground of gross neglect of duty when the evidence disclosed that appellant had been hospitalized for mental illness in the fall of 1951, in the winter of 1952-1953, and in July of 1953, and when the acts complained of took place between her hospitalizations?

"2. Under the evidence was it error to refuse the wife separate maintenance when the husband refused to provide a home for his wife and when he made her live with her parents?

"3. Was it error to refuse the wife the custody of the children when the evidence disclosed that the children could live with their mother and her parents?"

With respect to the first question presented we think the answer should be in the affirmative. When parties are married they take each other for better or worse. If the wife should become ill of tuberculosis, cancer, or any other disease, and be unable to perform her household duties as well as she ordinarily would perform them, we would not be willing to say that the husband was entitled to a divorce because of that situation.

In *Smith v. Smith*, 22 Kan. 699, the court (Brewer, J.) had this to say:

". . . The expression, 'gross neglect of duty,' is indefinite, and it is difficult to lay down any general rule by which every case can be determined to be within or without its limits. Each case must be examined by itself. And yet an examination of the whole body of the divorce act will suggest certain things as to the legislative intent in this expression. And first, it is not mere neglect of marital duty. The adjective 'gross,' whatever may be said of it as a mere term of vituperation in other relations, here has legal force as descriptive of the conduct of the party neglecting duty. If it were not so, and any mere neglect of duty were ground for divorce, the aid of the courts might as well be abandoned, and voluntary separation permitted. There must not only be a default, but the default must be attended with circumstances of indignity or aggravation." (pp. 700, 701.)

In *Franklin v. Franklin*, 53 Kan. 143, 35 Pac. 1118, the husband's application for divorce upon the grounds of abandonment was refused and the evidence disclosed that material facts complained of by the plaintiff occurred when the defendant was temporarily insane. The court held:

"To reverse the judgment of a district court refusing a divorce on the ground of abandonment, the evidence showing an intentional desertion for at least one year must be clear, convincing, and uncontradicted, and it must also appear that such abandonment was not the result of the plaintiff's own wrongdoing." (Syl. 1.)

While in this case plaintiff was never adjudged insane, we think the rule stated in the authority last quoted is applicable. What she had was an illness which affected the "emotions and the moods" for which she was treated as necessity therefor arose.

As we view this record the defendant is the one who concluded to break up this marriage. After he had taken plaintiff to her home, her mother and sister, Margaret, saw him at Olathe and after some conversation plaintiff asked, "You mean I am never going to be able to go back and keep house." And he said, "No, I had a sample of your housekeeping last spring." There are authorities holding that to constitute abandonment on his part. See the cases collected in the Annotations in 19 A. L. R. 2d, p. 1428. He may have thought also that her illness might get worse and hoped to get away from the responsibilities that situation would produce.

We take note of the fact that the evidence does not disclose that plaintiff made any complaint about the defendant. He did say that she argued with him about being taken to Osawatomie the second time. The necessity of that was the proper subject for a discussion. And, we note he speaks about her arguing with him at other times. There is no suggestion the matters discussed then were not proper subjects for her to express her views. His real complaint is that he did not like the way she kept house and cared for the children. She "put her finger" on what she thought about that. She stated that she was tired of an evening after she had worked with the children all day. It must be remembered these children were born pretty rapidly. Many women would have been tired in the evening after caring for them all day. Defendant should have known that and either asserted himself to help with them, or hired someone to do so. His income was sufficient to justify that. She had help only one week after the last child was born.

We are confident in concluding that the evidence did not justify the granting of a divorce to defendant. We are confident also that the testimony did not justify a finding by the trial court that plaintiff is an unfit person to have the custody of the children. The record shows no suggestion of immorality or any other serious trait of plaintiff. She is fond of the children, wants them with her, and the last time she was at the Osawatomie Hospital the doctor advised that she have them with her. Some of the complaints made about her and the care of the children are trivial in the extreme, others obviously brought about by her illness which affected her emo-

tions and moods, justifying shock treatment. Perhaps these will recur, perhaps not.

There is ample evidence to warrant granting plaintiff the relief prayed for in her petition for separate maintenance upon the ground of extreme cruelty and gross neglect of duty. It is difficult to think of anything more cruel to a wife and mother of three small children than to tell her that she cannot see those children any more; that he is taking them to his mother to raise; that she cannot go to their own home, and to take her to the home of her parents.

If there is any occasion for the court to make an order respecting the custody of the children preference should be given to their mother. The evidence discloses that plaintiff can take the children to her home and care for them, and if for any reason that cannot be well done her parents are able to and will assist in providing for their care. The record shows the court gave the custody of the children to defendant; he turned that over to his mother who has shown a disposition which almost precludes plaintiff's opportunity to visit the children. This should not be repeated.

We have examined the authorities submitted by appellee and find no particular necessity of discussing them in detail.

The result is that the judgment of the trial court should be reversed with directions to set aside the decree of divorce granted to defendant and the finding plaintiff is not a fit person to have the custody of the children; to grant the prayer of plaintiff's petition; to make such order, if any be necessary, with respect to the custody of the children as appears proper at the time, and the court shall make an order that defendant pay plaintiff for her maintenance a sum computed at the rate of $50 per month, from the date of the judgment appealed from, February 19, 1954, until the filing of this court's mandate in the trial court and until the further order of the trial court.

It is so ordered.

ROBB, J., not participating.