No. 40,231

LEON JACKSON, *Appellee*, v. VENA IRENE JACKSON, now VENA IRENE JACKSON FRENCH, *Appellant*.

(309 P. 2d 705)

Opinion filed April 6, 1957.

*Richard A. Hickey,* of Liberal, argued the cause and *Hayden C. Covington,* of Brooklyn, New York, *Collis R. Harner,* of Dodge City, *Rex A. Neubauer,* of Liberal, were with him on the briefs for the appellant.

*Chas. Vance,* of Liberal, argued the cause and *H. Hobble, Jr.,* and *Chester A. Nordling,* both of Liberal, were with him on the briefs for the appellee.

The opinion of the court was delivered by

HALL, J.: This is an appeal from an order of the district court changing the care, custody and control of minor children.

Leon Jackson, appellee herein and as plaintiff, filed an action for divorce against Vena Irene Jackson (now French), defendant and appellant herein. On defendant's cross petition Vena Irene Jackson was awarded a divorce from plaintiff, a division of the property and the care, custody and control of the three minor children; Stephen age 7, James age 5, and Dianne age 3.

The court gave the plaintiff the right of visitation at reasonable times, the further right to have custody for a period of 60 days during June and July of each year subject to the right of visitation by defendant during that period. The court further ordered the plaintiff to pay $50.00 a month for the support of each child until the child should become of legal age and retained jurisdiction for any further orders.

The plaintiff previously appealed to this court from that portion of the judgment awarding custody of the children to the defendant (*Jackson v. Jackson*, 175 Kan. 418, 264 P. 2d 1087).

In that case, plaintiff specified as error the district court's order awarding the custody of the minor children to the defendant and the overruling of his motion for a new trial. This court affirmed the judgment of the trial court.

On July 28, 1955, the plaintiff filed a motion for a change in the order of the custody of said minor children.

On August 9, 1955, defendant filed a motion for allowance of attorney fees and August 29, 1955, defendant filed her answer to plaintiff's motion to change custody of minor children and requested the court to make findings of fact and conclusions of law.

On September 5, 1955, the time set for hearing, defendant filed a motion for continuance of the matter which was overruled by the court. Defendant moved the court in accordance with G. S. 1949, 60-2934, that upon concluding the evidence of the witnesses present in court that the court continue the matter until she could procure the evidence of two of her chief witnesses and that 15 days would be adequate. The court denied the continuance but ordered the affidavits submitted in the motion to be admitted as the testimony of the missing witnesses, Dr. LeNeve and Mrs. Helen Johns. Plaintiff admitted the contents of said affidavits as to what the witnesses would testify but denied its truth, materiality, relevancy and competency.

On or before December 24, 1955, the court gave tentative findings of fact and conclusions of law with notice that judgment accordingly would be entered at the regular January motion day in Richfield on January 3, 1956.

On December 24, 1955, defendant filed a motion for additional findings of fact. A motion was also filed to strike portions of the court's proposed findings of fact and conclusions of law.

The final findings of fact and conclusions of law of the court were filed on January 16, 1956. Judgment was presumably entered by the court on January 6, 1956.

On January 5th, defendant again filed motions directed against the court's findings and conclusions and on January 6th filed a motion for new trial and for stay of execution during appeal to the Supreme Court.

The Journal Entry of judgment filed January 16, 1956, changed the care, custody and control of said minor children from the

defendant to the plaintiff subject to the reasonable rights of visitation in favor of defendant. The court also awarded judgment against the plaintiff and for the defendant in the amount of $300 for attorney fees and expenses of her attorneys.

The court further heard the motions of defendant for additional findings of fact, to strike certain portions of the amended findings of fact and conclusions of law, the motion for stay of execution and the motion for a new trial.

The court sustained two portions of defendant's motion for additional findings of fact and overruled the balance of said motions. The motion for stay of execution and for new trial were overruled.

The court retained jurisdiction over the subject matter of the custody of the children as to modifications and changes of orders as may in time prove necessary.

Defendant makes five specifications of error.

It is only necessary to consider the first specification. As appellant aptly states in his brief:

"This assignment of error is the 'meat' of the lawsuit. Appellant contends that the real, underlying reason for depriving her of custody was her membership in Jehovah's Witnesses and training the children in that faith. The entire 'emotional instability' argument against her, as previously shown, was a mere subterfuge to cover up infringement upon Appellant's religious freedom. A critical reading of the record bears this out."

This specification of error is as follows:

"(A): The Trial Court committed a substantial abuse of its judicial discretion in making these orders, as the record overwhelmingly showed fitness of the Appellant, mother of said children, to remain their custodian, and there was no evidentiary basis for the following findings of the Court upon which its decision and judgment was predicated, namely:

"1. That Appellant suffered from nervous instability, emotional abnormality and psychopathic tendencies, which were being communicated to the three children.

"2. That the 'environment' of the children under custody of Appellant (i. e., being raised in the faith of Jehovah's Witnesses and associating to a considerable extent with Jehovah's Witnesses) was improper and not so stable and normal a home life as the children could have in the custody of Appellee and the stepmother, both of whom are not Jehovah's Witnesses.

"That in this latter finding above the Court violated the tenets and precepts of the First and Fourteenth Amendments of the Federal Constitution and Section 7 of the Kansas Bill of Rights, guaranteeing religious freedom and cases interpretive thereof that no religion should be preferred above another, providing there was nothing subversive to the United States of America or the principles of common decency in the teachings thereof. While the Trial

Court paid lip service in its Findings and Conclusions to the above Constitutional Law principles, it went absolutely contrary to them in its determinations of this case. . . ."

While a reading of the entire record of the case may not prove the element of subterfuge, the whole question of religion so permeates the record that this court believes defendant's specification of error is well taken.

Religion was inherently in the case from its very inception. While plaintiff's motion for change of custody did not specify grounds, it was alleged in defendant's answer that plaintiff's counsel stated the allegations of plaintiff's motion were based upon the following facts:

"(A): That Defendant allegedly is a person of emotional instability and psychopathic tendencies to the extent such alleged condition renders her an unfit custodian of said children.

"(B): That Defendant is allegedly a poor housekeeper, cook and caretaker of the children, nags at said children, and keeps them both emotionally upset and in a manner that is not conducive to their physical well being.

"(C): That by virtue of the fact Defendant is an admitted member of Jehovah's Witnesses, by subjecting the children to such teachings, they will tend to become overtired and emotionally upset, and compelled to give attention to religious instruction, within the precepts of said Jehovah's Witness organization, to the end that their physical well being will be adversely affected.

"(D): That by virtue of Defendant's admitted Jehovah Witness membership, said children will be brought up in a manner that will tend to make them unpatriotic citizens of the United States, and that for said reasons, the two male children of the parties will in all probability refuse to accept military service in the armed forces of the United States and become of necessity conscientious objectors."

In its tentative findings of fact the court also found the plaintiff was basing his motion on the above four grounds.

The evidence in the trial was replete with testimony and exhibits as to the tenets of Jehovah's Witnesses and the possible effect of such beliefs upon the children. Plaintiff's first witness identified and the court admitted the following books as plaintiff's Exhibit "1":

"That they (the children) brought a bunch of books which their mother told them they were to read during the summer.

"Plaintiff's counsel produces the books as Plaintiff's Exhibit '1' consisting of eight books. (. . .: one was King James Version of the Bible, one was a brown-covered study book of Jehovah's Witnesses, entitled: 'Let God Be True,' the third was a blue-covered study book of Jehovah's Witnesses for children's instruction, the fourth was a green-covered 1953 Yearbook of Jehovah's Witnesses with front thirty pages approximately describing tenets of faith.)"

The court made twenty final findings of fact.

In findings two and three, the court found:

"2. The physical treatment of the children by the mother, and by the father and stepmother, is good and all that could be reasonably desired.

"3. Both the Plaintiff and the Defendant have adequate homes, close to adequate schools, for the proper educational and physical welfare of the children."

The court also found:

"6. Between the time of the trial in February 1953 and the time the decision on the appeal was entered by the Supreme Court on December 12, 1953, the emotional and nervous disturbance of the Defendant, Vena Irene Jackson, increased to the point that the Defendant had a nervous breakdown which resulted in hospitalization. Although the Defendant has apparently recovered physically from the nervous breakdown which resulted in hospitalization, she has not recovered from her nervous and emotional disturbances which are greatly accentuated by problems different from those to which she is accustomed.

"15. The emotional and nervous instability and abnormalities of the Defendant Vena Irene Jackson are being and have been transmitted to the three children, and the same has had adverse effect upon the emotional development of the children and should not be continued.

"16. Plaintiff's home, as now constituted, is the best place for the children. Plaintiff's wife, by reason of training and experience, is especially fitted to aid in overcoming the emotional disturbances of the children, and a transfer of the children to the Plaintiff's home is necessary for their future welfare.

"18. Defendant, by reason of her nervous and emotional instability, cannot provide the children with as good home environment as the Plaintiff can at this time."

These findings alone might have supported the court's judgment but the court also made these additional findings all of which pertain to religion.

"9. In each interview the Court mentioned the question of military service. The older boy, Stephen, of the age of 9 years, used the answers of the other witnesses testifying as to the beliefs of the Jehovah's Witnesses, to the effect that the choice of military service was left up to the individual and he would make up his mind when he was eighteen years old, and at the time he was required to register.

"10. The boy James, of the age of 7 years, when asked the same question, stated that he would be a conscientious objector and when asked what would happen in such instance answered that he would have to go to prison, but that he preferred going to prison to being in the army. When asked why he had such preference he stated that he knew what the army would be like, but he did not know what prison was like, and he wanted to see what prison was like, just like 'Gene Harvey' (a Jehovah Witness who served in the Federal Penitentiary for failure to register). He stated that Gene Harvey served a term in prison, and that he wanted to be like Gene Harvey."

The Journal Entry amended paragraph 10 as follows:

"Paragraph 10 of the Court's Amended Findings of Fact next to last sentence was amended by interlineation to read: 'When asked why he had such preference he stated that he knew what the army was like, but he did not know what prison was like, and he wanted to see what prison was like, just like 'Gene Harvey' (a Jehovah Witness who served a term in the federal penitentiary for refusal to accept noncombatant labor service in lieu of induction).'"

"11. The five-year-old girl, when military service was mentioned, asked the Court if it was not wrong to kill, with which the Court agreed, and she then volunteered the statement that in the war men cut off women's breasts and carried them around in their pockets. When asked who told her that, she stated that it was Mrs. Planque. Mrs. Planque was a witness in the case on behalf of the defendant. She and her husband are Jehovah's Witnesses, and her husband, who also testified, was what they call a 'servant.'

"12. The evidence disclosed that the defendant, during the two days hearing on this motion, stayed with the Planques.

"13. The defendant joined the Jehovah's Witnesses approximately 18 months ago, and since the original divorce hearing in February of 1953. She stated that she and the children had studied with the Planques and other Jehovah's Witnesses many times, and on an average of about two times a week.

"14. Pursuant to her faith as a Jehovah's Witness, Defendant does not teach the children to salute the flag. She will not teach them to accept military service when the two boys become of age when they are subject to Selective Service laws. The defendant, however, testifies she respects the flag, will stand at attention when the flag passes, but will not raise one hand in salute, or place her hand over her breast. The children will not have pressure placed upon them as to what their own decision will be when they become subject to military service. The Jehovah's Witnesses do not make gift exchanges at Christmas, under the belief that Christmas is a religious occasion not to be commercialized. Neither do they participate in Easter Egg hunts and similar modern day observances, on the ground that such observances are pagan in character. The children are taught these beliefs, but are permitted to make their own decisions as to whether they will participate in such celebrations. The family has gift exchanges on other dates not religious in character."

Upon all these findings the court made the following conclusions of law.

"1. Religious freedom, as guaranteed by our Constitutions, should be faithfully upheld, and religious teachings to the children by a parent or parents, regardless of how obnoxious the same might be to the Court, the other parent or the general public should not and must not be considered as basis of making child custody orders.

"2. The Court does not believe that affiliation with the Jehovah's Witness organization, of itself, disqualifies a person from having custody of children. Neither does the Court feel that such affiliation is a necessary qualification for

such custody to the effect that other elements should be eliminated from consideration.

"3. It is the order of the Court that the Plaintiff should have the care, custody and control of the minor .children, effective at the end of the school semester in January 1956.

". . . Since this motion was instituted by the Plaintiff and the Defendant was obligated to defend, the Court renders judgment against the Plaintiff and in favor of the Defendant for the sum of $300.00 as attorney fees and expenses."

It is well recognized in this state that the jurisdiction of the district court over minor children is a continuing jurisdiction and its orders concerning the custody, control or support of the children may be changed from time to time as conditions require. (*Goetz v. Goetz,* 180 Kan. 569, 306 P. 2d 167; *Hayn v. Hayn,* 162 Kan. 189, 175 P. 2d 127; and *Ramey v. Ramey,* 170 Kan. 1, 223 P. 2d 695.)

Likewise, it is the law of this jurisdiction that the paramount consideration of the court is the welfare and best interest of the child. (*Westhafer v. Westhafer,* 125 Kan. 43, 262 Pac. 555; *Janney v. Janney,* 159 Kan. 230, 154 P. 2d 131; *Lamberson v. Lamberson,* 164 Kan. 38, 187 P. 2d 366; *Decker v. Decker,* 171 Kan. 380, 233 P. 2d 527; *Hedding v. Inman,* 172 Kan. 567, 241 P. 2d 479; and *Jackson v. Jackson,* 175 Kan. 418, 264 P. 2d 1087.)

This court has repeatedly taken the position that the trial court is the best judge of the best interests of the child and for this reason in the absence of abuse of sound judicial discretion in awarding the custody and control of minor children, the judgment of the district court will not be disturbed on appeal. (*Goetz v. Goetz,* supra; and *Travis v. Travis,* 163 Kan. 54, 180 P. 2d 310.)

However, where an abuse of sound judicial discretion is affirmatively shown in the record, this court has not hesitated to reverse, modify or otherwise change the order of the district court. See *Wilkinson v. Wilkinson,* 147 Kan. 485, 77 P. 2d 946; *Lindbloom v. Lindbloom,* 177 Kan. 286, 279 P. 2d 243.

The only question upon this appeal is whether or not the court abused its discretion by allowing the matter of religion to become an integral part of its determination of this custody matter.

The problem of religion in custody matters has previously been before this court.

Justice Burch wrote in *Denton v. James,* 107 Kan. 729, Syl. 5 and 6, 193 Pac. 307, where the court said:

"Aside from teachings subversive of morality and decency, and some others equally obnoxious, the courts have no authority over that part of a child's train-

ing which consists in religious discipline, and in a dispute relating to custody, religious views afford no ground for depriving a parent of custody who is otherwise qualified.

"In this instance the child's mother was a Roman Catholic, and the father agreed the child should be reared in its mother's religious faith. The maternal grandmother is a Roman Catholic, and the mother by adoption is not. *Held*, the facts stated afford no ground for depriving the mother by adoption of custody of the child during the school year."

The court further said on pages 736 and 737:

"Having all the rights of a natural parent, Sallie Denton has the right to control the education of the child, and the finding of the district court that it was the best interest of the child Isabelle James should have custody during the school period of each year, was contrary to law. Section 7 of the bill of rights of this state reads as follows:

'The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted, nor any preference be given by law to any religious establishment or mode of workship. . . .' (Gen. Stat. 1915, § 111.)

"In the case of *Watson v. Jones*, 80 U. S. 679, the supreme court of the United States enunciated a principle which is as applicable here as it was in the controversy under decision:

'In this country the full and free right to entertain any religious belief, to practice any religious principle, and to teach any religious doctrine which does not violate the laws of morality and property, and which does not infringe personal rights, is conceded to all. The law knows no heresy, and is committed to the support of no dogma.' (p. 728.)

"Aside from limitations of the general character indicated the courts have no authority over that part of a child's training which consists in religious discipline, and in a dispute relating to custody religious views afford no ground for depriving a parent of custody who is otherwise qualified. The agreement of the child's father and mother that the child should be reared in the Catholic faith was a commendable compromise between two natural guardians who, under the statute of this state, had equal authority. On the death of the mother, the father's right to educate his child became paramount, and the agreement was merely persuasive upon him. That right is now vested in Sallie Denton. Authorities on the subject of parental right to control religious education of a child are collated in an article in 29 Harvard Law Review, at page 485 (March, 1916). Because of the settled views of this court concerning the nature of the parental relation, and the rights flowing therefrom, *The question of religion cannot be regarded as entering into this case*. It is conceivable that, on change in custody of a child of peculiar temperament, ill-considered proselyting might be so begun and carried on as to destroy completely the foundation of all faith, and lead to positive immorality. It will be time enough to deal with such a case when it arises." (Emphasis ours.)

This rule is followed in many states. Similar decisions are *Cory*

*v. Cory,* 70 Cal. A. 2d 563, 161 P. 2d 385; *Stone v. Stone,* 16 Wash. 2d 315, 133 P. 2d 526; *Reynolds v. Rayborn,* 116 S. W. 2d 836 (Tex. Civ. App. 1938); and *Salvaggio v. Barnett,* 248 S. W. 2d 244 (Tex. Civ. App. 1952), 344 U. S. 879, 97 L. ed. 681, 73 S. Ct. 176, 43 A. L. R. 2d 393.

The United States Supreme Court denied certiorari in the Salvaggio case. Because of its similarity to this case, the following is quoted from 43 A. L. R. 2d 393 regarding it.

"The original divorce decree awarded to the father, Lee Salvaggio, the exclusive custody of the infant daughter of the parties, Judy Suzzan, because of the mother's inability at that time to provide for her support. Both parties subsequently remarried, the mother to a Mr. Barnett, and, having thereby acquired a comfortable home and the financial ability to care for the child, she sought, by the present proceeding, in which she was joined by her husband, to have the custody of the child transferred to her. The trial court found that the father and stepmother, as well as the mother and stepfather, were fit and proper persons to have the custody of the child, except that the father and stepmother, because of their belief that the Bible so requires, proposed to teach her that it is wrong to salute the American Flag, to celebrate and exchange gifts at Christmas, and to kill others even in the defense of the United States. Upon the foregoing facts and findings, the court made the following conclusion: 'The change of condition affecting the welfare of such child include the change in the financial circumstances of Betty James Barnett and her ability to provide a suitable home for the child. However, in arriving at its conclusions, the Court is primarily influenced by the proposed teachings of Lee Salvaggio and his present wife with reference to saluting the flag, fighting in defense of the United States and celebration of Christmas. The Court judicially knows that the overwhelming majority of other children in this state and in the community where Judy Suzzan Salvaggio will reside and go to school will be taught to salute the American Flag, to defend the country against enemies, and will exchange gifts and celebrate Christmas. The Court concludes that such fact would produce problems and conflicts adversely affecting the welfare of such child. Without in any way infringing upon the right of Lee Salvaggio and his present wife to interpret the Bible as they see fit, the Court is of the opinion that as between the natural parents of such child, the best interests of the child would be served by her being placed in the custody of the parents who will rear her in the normal atmosphere of an American home.' The Court decreed, accordingly, that the custody should be transferred to the mother, and this action was affirmed, on appeal, as having ample legal support in so far as it was based on the ground that a mother's care and attention for a young female child are for the child's best interest. But with respect to the consideration of the religious beliefs and practices of the father and stepmother, the appellate court said: 'Under the American principle of separation of Church and State, the secular power is so shackled and restrained by our fundamental law that it is beyond the power of a court, in awarding the custody of the child, to prefer, as tending to promote the interest of the child or surround it with a more normal atmosphere, the religious view or teachings of

either parent . . . It is in no way contended that appellant's religious teachings to his child would be immoral or illegal, but merely that they would be unpopular.' "

Appellee raises the point that appellant has waived her right to review by acquiescence in accepting the $300.00 attorney fees allowed her. Appellee makes reference to the well established rule to the effect that a litigant who complains of a judgment must be consistent in his conduct with reference to it. If he recognizes its validity, he will not be held to say that it's invalid. He cannot on appeal contest its validity where he has accepted the benefits or a substantial part of the benefits of the challenged judgment (*Ralston v. Ralston,* 125 Kan. 619, 264 Pac. 146).

Appellee cites *Ralston v. Ralston,* supra; *Fadely v. Fadely,* 128 Kan. 287, 276 Pac. 826; *Morton v. Morton,* 149 Kan. 77, 86 P. 2d 486; and *Elliott v. Elliott,* 154 Kan. 145, 114 P. 2d 823.

The Elliott and Morton cases were divorce cases, but in each case the appellant had accepted a property settlement. Attorney fees were not involved. Attorney fees were involved in the Ralston and Fadely cases, but these cases involved partition actions and the attorney fees were included as benefits of the judgment.

Under the provisions of G. S. 1949, 60-1507 and the cases of this court, a wife is entitled to attorney fees for "the efficient preparation of her case" in divorce, alimony and custody actions. The acceptance of such attorney fees does not come within the rule of acquiescence in the benefits of a judgment.

In its conclusions of law, the district court apparently regarded the rule of religion in custody cases, but the findings of the court are so inconsistent with the rule that the record cannot be allowed to stand as it is. In this custody case, the record affirmatively shows religion was in it from beginning to end. The court may have had other good and sufficient reasons for changing custody, but they cannot be distinguished from those of religion. We must hold from the record that the court abused its discretion and that its order changing custody must be set aside.

For the reasons stated, the judgment of the court changing custody is set aside, and cause remanded for further proceedings in accordance with this opinion.

It is so ordered.

PRICE. J., dissenting: I am unable to agree to the disposition made of this case. In a matter of this kind the determination of

what is for the welfare and best interests of a child naturally covers a wide scope of inquiry. It is quite true that considerable evidence concerning the matter of religion was introduced, and also it is true that the subject was mentioned in the trial court's findings and conclusions. I am in accord with what was held in *Denton v. James,* 107 Kan. 729, 193 Pac. 307, 12 A. L. R. 1146, to the effect that in a dispute relating to custody religious views afford no ground for depriving a parent of custody who is otherwise qualified, but I think it may not be said that here the trial court's decision was based solely on the ground of religion. In fact, conclusions 1 and 2 make it clear that it was not. If a divorced parent's extreme religious views and activities are such as to result in emotional instability in such parent, then most certainly I feel that a trial court has not only the right, but the duty, to take such fact into consideration in the determination of what appears to be the welfare and best interests of the child and to which parent custody should be granted. As I read this record, that, in reality, was what was done in this case. Custody matters always are difficult for trial courts. After a full-scale hearing a custody order was entered. I see nothing erroneous about it or anything that savors of an abuse of discretion. I would affirm the judgment.

WERTZ, J., concurs with the foregoing dissent.