No. 47,293

BEVERLY RUTH DALTON, *Appellee,* v. WILBUR JACK DALTON, *Appellant.*

(522 P. 2d 378)

Opinion filed May 11, 1974.

*La Vone A. Daily,* of Scott, Daily & Vasos, of Kansas City, argued the cause and was on the brief for the appellant.

*Robert G. Jones,* of Overland Park, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

FONTRON, J.: In April, 1973, Mr. and Mrs. Dalton (Jack and Beverly), were divorced each from the other. As part of the decree, Mrs. Dalton, the plaintiff herein, was granted custody of the two younger Dalton boys, Stephen Sean, born March 17, 1966, and

David Brian, born May 24, 1970, while Mr. Dalton, the defendant, was awarded custody of the older son, Jeffrey Scott, born January 23, 1960. Mr. Dalton desires to have custody of Stephen and David, also, and he has appealed from the order placing them with their mother.

The sole issue on appeal is whether the trial court abused its discretion in granting custody of Stephen and David to Mrs. Dalton. To get at this issue it will be necessary to sketch a somewhat unsavory background.

Mrs. Dalton was 35 years of age at the time of the divorce; Mr. Dalton was 39. They were married in Wichita, February 6, 1959. Beverly had been previously married and divorced. She had one son by the first marriage; his custody was awarded to his father. When the Dalton marriage broke up, Jack was the assistant manager of a Kansas City retail store and Beverly operated a beauty shop in the home. Neither party complains of the property division arranged by the court, or the amount set for child support. At oral argument this court was advised that both parties have remarried.

It is obvious from the record that the union was not smooth during the past few years of its existence, but that incompatibility was a frequent visitor in the Dalton home. We shall not, however, probe into the troubled details of the separation except as to matters which in our opinion appear pertinent to the issue of custody.

In the summer of 1971, Mrs. Dalton struck at the very heart of the marriage by entering into a liaison with a young neighbor lad, barely fifteen years of age and without prior sexual experience. The relationship, unknown to Mr. Dalton, extended over a period of several months. Details concerning the inception of the illicit love affair differ somewhat but it cannot be questioned that relations were had a good many times, usually in the Dalton home when Jeff would be sent to the store and the bedroom door would be barricaded against intrusion by the younger children; that on one occasion after dark had fallen police officers found the lovers in a compromising position, picked them up and took them both to the station; that Mrs. Dalton became pregnant by the young boy friend and, on March 2, 1972, underwent a therapeutic abortion. The youthful paramour testified that relations continued even after that, but Mrs. Dalton denied this. In answering interrogatories prior to trial Mrs. Dalton declined to say, on the ground of self-incrimination, whether she had had sexual relations with anyone else after her

marriage to Jack and before filing for divorce on October 3, 1972. At the trial, however, she denied other extramarital activity during that period.

There can also be no doubt—in fact, Beverly conceded as much—that she commenced having sexual relations with a twenty-year old youth soon after filing for divorce and that the new young man spent quite a bit of time at her house after Jack was compelled to leave in response to an *ex parte* order. On oral argument we were told by Jack's counsel that her present husband is a different twenty-year old male.

In oral remarks made at the time of entering its custody order, the trial court said:

"The Court finds that there has been conduct on the part of the plaintiff which has been generally, candidly admitted, the conduct being inappropriate. Perhaps bizarre. Perhaps immoral. And certainly indiscrete [sic]. . . ."

Accompanying the evidence of Beverly's deviate behavior is testimony coming from neighbors, undenied in the record, that the two younger boys often played in the street unsupervised, and unknown to Beverly, and that they roamed the neighborhood without their mother knowing their whereabouts; that motorists had to stop their cars and remove the boys from the street; that Beverly used vulgar and profane language directed toward Jeff and in front of the younger boys; that three-year old David had not been toilet trained (although Jack was attempting it) and that he appeared in neighborhood yards shoeless and clothed only in diaper and shirt during cold weather; that Beverly was antagonistic toward Jeffrey, who in one neighbor's opinion, needed a mother's love and counsel; that Beverly had three times attempted, or simulated, suicide efforts —to only once on the part of Jack—and that she had been advised, to no avail, to seek psychiatric help; that she spent several nights each week at the neighbors' after Jack got home, returning anywhere from ten o'clock to one or two a. m.

It is against this highly unusual and unique background that we are asked to say that the trial court abused its discretion in awarding the custody of Stephen and David to their mother.

Certain rules with respect to child custody are firmly settled in our law. Where the issue is between the parents of a child the primary question for determination is what best serves the interests and welfare of the child, and all other questions are subordinate to that. (*Collins v. Collins*, 177 Kan. 50, 53, 276 P. 2d 321; *Gardner v.*

*Gardner,* 192 Kan. 529, 533, 389 P. 2d 746; *Adkison v. Adkison,* 206 Kan. 125, 476 P. 2d 216; *Moudy v. Moudy,* 211 Kan. 213, 505 P. 2d 764.) We have also been consistent in asserting that the trial court is in the most advantageous position to judge how the interests of a child may best be served and that its judgment in such regard will not be overturned in the absence of an abuse of judicial discretion. (*Hazelwood v. Hazelwood,* 190 Kan. 493, 376 P. 2d 815; *Gardner v. Gardner,* supra; *Kimbell v. Kimbell,* 190 Kan. 488, 490, 376 P. 2d 881.) However, in *Gardner v. Gardner,* supra, p. 532, it is also written: ". . . where an abuse is affirmatively show in the record, the court has not hesitated to reverse, modify or otherwise change the order of a trial court. (*Lindbloom v. Lindbloom,* 177 Kan. 286, 279 P. 2d 243; *Wilkinson v. Wilkinson,* 147 Kan. 485, 77 P. 2d 946; *Jackson v. Jackson,* supra [181 Kan. 1, 309 P. 2d 705].)" Our latest decision in a long line of cases exemplifying the principles stated above is *St. Clair v. St. Clair,* 211 Kan. 468, 507 P. 2d 206, an action in which we reversed an order of the trial court which had awarded custody of two small children to their father.

Without further belaboring the sordid background of this case, with its errant sexual behavior on the part of the mother, coupled with a general inattentiveness toward what we believe are normal parental responsibilities, we have reached the conclusion that on the record as it stands the trial court abused its discretion in awarding Mrs. Dalton the custody of two young sons of impressionable age.

We have not come to this conclusion lightly, for this court has always recognized the value of maternal love and care where children of tender years are concerned. (*In re Bort, Petitioner, &c.,* 25 Kan. 308.) In *Bierce v. Hanson,* 171 Kan. 422, 427, 233 P. 2d 520, we said that a mother, absent a finding of unfitness, ordinarily is entitled to the custody of a child of tender years. So great has been our respect for maternal guidance of the young, so deep our regard for a mother's love and affection, that we have gone to the length of saying, in *St. Clair v. St. Clair,* supra:

"It is an elementary rule in this state that if children are of tender age they almost of necessity must be entrusted to their mother's care, without weighing unduly what may be some possible shortcomings in her character or conduct. (*Janney v. Janney,* 159 Kan. 230, 154 P. 2d 131 and *Adkison v. Adkison,* 206 Kan. 125, 476 P. 2d 216.)" (p. 479.)

Use of the word "almost" appearing in the quotation is not to be overlooked, even though the trial court may well have done so in

this case as it entered the custody order. In oral remarks, to which we have already referred, the trial court said:

". . . Most recently the Supreme Court of Kansas in the St. Clair case, said that if children are of tender age, they almost of necessity must be entrusted to their mother's care without weighing unduly what may be some possible shortcoming in the mother's character or conduct."

Almost, but not quite of necessity, is custody of small children to be placed with the mother. Judicial discretion must still be exercised by the trial court and on appeal this court must remain the arbiter of whether discretion has been abused.

The St. Clair case is to be interpreted in the context of its factual setting. Our holding to the effect that judicial discretion had been abused in that case was primarily predicated on the reliance which the court had placed on testimony given by certain witnesses as to the wife's conduct during a period of mental illness and its rejection of the testimony of the same witnesses concerning the improvement in her mental health after undergoing psychiatric treatment. Such, however, is not the situation we have here. Mrs. Dalton refrained from seeking psychiatric help recommended by her doctor. There is no "before and after" testimony in this case.

Moreover, the St. Clair case is distinguishable on another ground. Mrs. St. Clair was shown to have had warmth and mother love for both her children. No lack of maternal affection was disclosed on her part. In authoring the opinion, Mr. Justice Schroeder had this to say:

"The record presently under consideration is replete with evidence disclosing the warmth of the mother and her love for her children. . . ." (p. 493.)

In contrast, Mrs. Dalton told neighbors she hated Jeff; that she was just not a homebody, and the kids just tied her down. There was evidence she swore at Jeff and used profanity at times when referring to her offspring. Her failure to keep track of the younger boys indicates an indifference to their welfare. On most week nights, after Jack got home, she left her family and took off for the neighbors' where she stayed until late hours. On the other hand the Daltons' backdoor neighbor spoke of seeing Jack play in the yard with the youngsters many times after coming home from work, while she never saw Beverly do so. Mr. Dalton frequently brought inexpensive toys home to the boys and never distinguished between them in dispensing small gifts. There is testimony by neighbors

from which it may be gleaned that Jack did a good deal of cooking, of staying with the children at night, of changing diapers and otherwise taking care of parental responsibilities and normal household chores. In *State ex rel. Watts v. Watts,* ____ Misc. ____, 350 N. Y. S. 2d 285, the New York court said:

"Studies of maternal deprivation have shown that the essential experience for the child is that of mothering—the warmth, consistency and continuity of the relationship rather than the sex of the individual who is performing the mothering function. . . ." (p. 290.)

It appears to this court that Mr. Dalton performed many of the functions customarily undertaken by the maternal member of a household.

We have not overlooked authorities cited by the plaintiff. In general, they reaffirm the rules which have ordinarily been applied throughout this jurisdiction to a custody decree. For example: In *Janney v. Janney,* 159 Kan. 230, 154 P. 2d 131, we upheld an order changing custody of a twelve-year old boy from his mother to his father; in *Adkison v. Adkison,* supra, we held it was an abuse of discretion for the court to take a five-months old girl from her mother and place her with the father, and we remanded the matter for rehearing before a different judge; and in *Greene v. Greene,* 201 Kan. 701, 704, 443 P. 2d 263, we reaffirmed the "best interest" rule as we upheld a custody award to the mother. Further analysis of cases found in plaintiff's brief would not, in our opinion, prove productive. They are neither factually in point, nor do they announce new legal principles.

For reasons set forth in this opinion, the case is reversed and remanded with directions to set aside the order granting custody of Stephen and David Dalton to their mother, Beverly Ruth Dalton, and to enter an order awarding their custody to the father, Wilbur Jack Dalton, subject to such reasonable provisions for visitation as the court may deem just and proper.

It is so ordered.