No. 43,691

AUGUST LONGO, *Appellee,* v. MARY LONGO, *Appellant.*

(395 P. 2d 302)

Opinion filed July 14, 1964.

*D. G. Smith,* of Girard, and *C. H. Menghini,* of Pittsburg, argued the cause and were on the briefs for appellant.

*J. John Marshall,* of Pittsburg, argued the cause and was on the briefs for appellee.

The opinion of the court was delivered by

FATZER, J.: The defendant wife was awarded an absolute divorce on her cross petition and she has appealed only from that part of the judgment making a division of the property and awarding temporary and permanent alimony, and the overruling of her motion for a new trial.

The sole question presented is whether the district court abused its discretion in failing to award the defendant all the property and lands separately acquired by her during the marriage by inheritance, gifts or otherwise, and in failing to award her an equitable division of the property jointly acquired by the parties during the marriage.

The plaintiff, August Longo, and the defendant, Mary Longo, were married September 23, 1939, in Lamar, Missouri, and are the parents of two sons, August Louis Longo, age 19, who lives in Chicago and is self-supporting, and Daniel Lee Longo, who was 16 at the time of the divorce, and presently lives with the defendant.

After their marriage, the parties moved in with the defendant's mother and stepfather, Antoni and Magdalena Kolpak, on a 160-acre farm in Crawford County, which is referred to as the "home

place," where they continued to live until their separation on June 1, 1962. While neither of the parties had any property, the defendant's parents owned the home place and had bank accounts in The Girard National Bank, The First State Bank of Arma, some cash, livestock, farm equipment, an automobile, and household goods and appliances.

The defendant presently resides on the home place with Daniel.

During the early years of the marriage, the plaintiff worked at Superior, Wyoming, and Parsons and Coffeyville, Kansas, but due to his drinking habits and lack of ability to support the defendant and her children, she remained on the home place.

On August 19, 1954, the Kolpaks executed a warranty deed to Mary and August Longo, conveying the home place to them as joint tenants with the right of survivorship and not as tenants in common. It was understood that the defendant's parents would continue to live on the home place and did live there until their death. No consideration passed from August or Mary Longo to the Kolpaks, and at that time neither of the grantees had accumulated any money or property. The Longos received the rent from the home place and August transacted all of their business including making all deposits to their joint accounts in The Miners' State Bank of Frontenac and The First State Bank of Arma. Neither Mary nor August had separate bank accounts and the family funds were deposited in their joint accounts in those banks.

Antoni Kolpak died in February, 1957, and Magdalena died December 25, 1957. Prior to Antoni's death, he and his wife had a joint bank account in The First State Bank of Arma, and after Antoni died, the account was changed to Mary Longo and Magdalena. There was a substantial balance in the account when Magdalena died. At the instance of the plaintiff, Mary drew a check from this account for payment of Magdalena's funeral expenses in the sum of $1,300.

The record is confusing as to the remodeling and improvements made to the home. The major operation was done by the Kolpaks prior to their death when they remodeled the house by taking off an outside porch, putting in a foundation, building an additional 14 x 14 room, fixing a pantry, changing the roof line to a bungalow-type roof and reroofing the house. The lumber used was principally from a house Antoni owned in Franklin, Kansas, some new materials which were paid for by the Kolpaks, and contributions from Virginia

Kostering, as hereafter noted. The next two improvements consisted solely of interior work done after Magdalena's death when the house was completely modernized and new appliances installed. The evidence was conflicting as to who paid for the remodeling and improvements. The plaintiff testified that the remodling cost $1,100, which he paid, and that he paid approximately $6,000 on the other two improvements. This was denied by Mary, and Virginia Kostering testified that she made substantial contributions to these improvements.

Virginia Kostering, Mary's sister, and her husband Neil live in a suburb of Chicago and own a prosperous printing business incorporated under the name of the St. Clair Specialty Manufacturing Company. They were extremely generous to the Kolpaks and to Mary and her family. During the Longos marriage, the Kosterings made gifts to the family in the form of automobiles, money orders, checks and cash donations in excess of $15,000. Some of the checks were payable to August and others were payable to Mary, but the moving force of all the gifts was for Mary's benefit. Exhibit No. 4 was a list of checks amounting to $2,200 which Virginia testified were payable to August. Exhibit No. 5 was a list of checks payable to Mary totaling $2,775. Exhibit No. 6 was a list of money orders sent to Mary totaling $1,540.55. Virginia testified that the lists of checks and money orders were not complete and did not represent all of the checks and money orders sent to the Longos. The record substantiates her testimony in that there were records of deposits made by August in the two banks of other checks from Virginia totaling $2,400. In addition to the checks and money orders listed in the exhibits, Virginia testified to the recollection of two checks, one for $200 and one for $100 sent to Mary just before Christmas in 1962. She testified she visited her parents during their lifetime and the Longo family frequently; that at times she had her mother and Mary visit her in Chicago; that when she came to Crawford County she always brought gifts for the entire family and while there she went shopping and bought groceries for the family; that she sent Mary gifts and things for the children and several times sent things to August; that she paid her mother's hospital and doctor bills at Hot Springs in the amount of $1,239.75; that she paid for the funeral expense of both her parents; that when advised Mary had withdrawn $1,300 from her account to pay for her mother's funeral expense, she sent a check in that amount to reimburse Mary

and that August deposited the check in their joint account; that when August wanted to buy the Bosinio farm, as hereafter noted, she and her husband flew to Pittsburg to investigate the farm and when they did not obtain all the information they wanted, her husband had August fly to Chicago to talk with him about it and that they paid August's expense, and that they arranged to buy the farm because August said, "This is the farm I want." Virginia further testified, "We were doing it for the entire family." She testified that she had given Mary and her family altogether some $2,000 in cash; that those gifts were in addition to all the checks and money orders previously testified to; that she gave Daniel $600 and August Louis $525 when they graduated; that she gave Mary 150 shares of stock in the St. Clair Specialty Manufacturing Company; that she and her husband gave Mary and her family a Chrysler automobile that cost $1,300; that during her visits in Mary's home she had never seen August working in the fields; that when her mother wanted to improve the home, she gave money for that purpose; that she also assisted in the expense of the two interior improvements to the home; that during the time Mary and August lived with her parents, her parents paid their way and that she assisted them by sending them money; that she and her husband had previously furnished a car for the use of the family but that August took the car in the mornings and was gone all day until late at night and Mary and her mother were left with no mode of transportation, and that was the reason she purchased the Chrysler automobile.

The plaintiff testified he had no knowledge whether his wife's parents had any money in bank accounts, although the record discloses he withdrew $500 from Antoni's account on May 16, 1949. He further testified that he had no knowledge of any gifts or money sent by Virginia or her husband to him or his wife, although some of the checks were made payable to him and all of the checks sent to August or Mary were deposited by him in their joint account. He admitted that the Kosterings made presents of $500 each to the two sons upon their graduation and also acknowledged a check from them for $1,000, but specifically denied knowledge of all other checks received. When the checks listed on Exhibit Nos. 4 and 5 were produced he still denied receiving them, but his counsel stipulated that the amounts were correct and should be admitted. It was further stipulated by counsel that the checks and money orders listed in the exhibits did not comprise all the checks, cash and money orders received by the parties from the Kosterings.

On June 10, 1960, the Kosterings purchased the 120-acre Bosinio farm near the home place for August and Mary. The purchase price was $16,000, and they paid $4,800 down, leaving a balance of $11,200 which was evidenced by a promissory installment note and a mortgage. The note was payable at the rate of $2,000 per year plus interest on the $11,200 from June 10, 1960.

On October 18, 1961, the Kosterings entered into a written contract with August and Mary for their purchase of the Bosinio farm. The agreement provided that if August and Mary made the remaining payments of $2,000 per year and reimbursed Neil and Virginia for the original $4,800, title of the property would pass to August and Mary. In the meantime, the Kosterings agreed to pay all taxes and insurance and all interest on the mortgage without expecting reimbursement from August and Mary. The agreement acknowledged reimbursement to the Kosterings of $2,000. Subsequently, Mary and August made two $1,000 payments on the contract.

During the marriage the parties acquired other real estate in the vicinity of the home place through their joint efforts: a 72-acre farm known as the Borello place on which they owed $4,000; an 80-acre farm known as the Forrester place, and a 5-acre tract. All of the real estate except the Bosinio farm and the Borello place was clear, and the total acreage owned by the parties was 434 acres.

August testified that the home place was not in the Soil Bank and that his total income from that source was $1,100, whereas in truth and in fact, he had the home place in the Soil Bank and received a total of $3,137.53 from that source. He avoided answering whether he withdrew $4,300 from the joint savings account of the parties in April, 1962, and on admonition of the court, stated that if the record showed he had withdrawn the amount, he did withdraw it, but he had no knowledge of what he did with the money. He failed to give any satisfactory account of what he did with the money and denied he bought a motel in Arma in the name of his cousin although he testified it was a good investment and that his cousin said he could live there since he had no place to live.

John H. Bedene, a banker at Arma, testified he had formerly appraised farm property and had been appointed an appraiser for the State Highway Commission. He appraised the home place at $27,000; the Forrester place at $5,250; the Borello place at $4,825; the Bosinio farm at $13,440, and the 5-acre tract at $200. O. E. Lamb, a real estate broker at Girard, testified the home place in-

cluding improvements was worth $22,000; the Forrester place $6,500; that he was not familiar with the Borello farm and did not have a judgment as to the value of the Bosinio farm.

No testimony was introduced as to what the personal property consisted of or it value, except the defendant listed various items in her amended cross petition, which are summarized: An unknown amount of cash; 38 head of cows and calves; Case tractor and plow; Oliver tractor with loader; two Massey-Harris combines; two three-bottom plows; international disc (hydraulic); four-section John Deere harrow; harrow carrier; rotary hoe; three-section spring tooth harrow; John Deere grain drill (fertilizer attachment); two corn planters; electric grain auger; air compressor; four trucks, and five automobiles.

Despite an arthritic condition which existed for many years in Mary's hands, in addition to her household duties, she did the chores, cleaned the stalls, milked all the cows, cleaned the mangers, worked in the fields and at harvest time drove a truck to market; handled wheat sacks and fertilizer, and when the house was re-modeled the last time she painted the walls, plastered the cracks and did other heavy work.

In addition to August's farming operations, he was engaged in business as an insurance agent, lime hauler or contractor, and most of the work on the farm was hired.

When the plaintiff left on June 1, 1962, he made no arrangements to support Mary and later stopped payment on her checks drawn on their joint bank accounts. She lived on two checks Virginia had previously given her and when that was exhausted, Virginia sent her other money. She testified that August sent three $75 checks for child support for Daniel.

In its final decree, the court awarded Mary the home place, the household goods, furnishings and appliances and all her personal effects and property then in her possession; temporary and perma-nent alimony in the sum of $2,500, and child support for Daniel of $50 per month. August was awarded all of the real estate except the home place and all of the personal property which the court found had a total value of $12,000. The court further awarded August all tax forms, canceled checks, files, records, papers and personal effects then in the home, and the 30 acre 1963 wheat crop then growing on the home place and granted him access to the property to harvest the crop.

Thereafter, the defendant filed a motion for a new trial and for more specific findings of fact. The court overruled the motion for a new trial but modified some of its findings made in the original decree, and found that:

". . . the value of the 'Home Place' hereinbefore described at page 2 is in the amount of $25,000.00, which a portion valued at $10,000.00 is set over to defendant as her own separately acquired property, having been acquired through inheritance and gifts and of which portion plaintiff has acquired no interest therein, thus leaving a balance of $15,000.00 as jointly acquired property.

"The Court further finds that in addition to the $15,000.00 jointly acquired property in the 'Home Place,' the parties hereto acquired the following assets and in the following amounts:

"1. Household goods and furniture, value $2,500.00;

"2. The 80 acre 'Forrester Property' and the fractional property containing 4.8687 acres described at page 6, value $5,000.00;

"3. 72 acre 'Borello Property' described at page 5, value of equity $3,000.00;

"4. 120 acre 'Bosinio Property' described at page 4, value of equity $4,000.00;

"5. All of the farm machinery, vehicles, cattle and other items of personal property, value $12,000.00, subject to indebtedness of $6,000.00, leaving equity of $6,000.00;

a total value of jointly acquired property of $35,500.00.

"The court further finds that one-half of the marriage assets and equities accumulated by the parties hereto in excess of the $10,000.00 set over to defendant as her separate property, should be given to the defendant herein as her division of property the same being represented by the $15,000.00 equity in the 'Home Place' over and above $10,000.00 aforementioned, and all of the household furnishings valued at $2,500.00, a total value of $17,500.00.

"The Court further finds that plaintiff is awarded as his sole and separate property all of the farm equipment and other personal property, vehicles, cattle and all of the interest and equity the parties may possess in the other items of real estate, (exclusive of the 160 acre 'Home Place')."

The district court directed the plaintiff to pay all unpaid taxes on the Bosinio property and to pay interest on the balance due on the purchase price at the rate of 7 percent per annum to be paid to the Kosterings. The court did not change its award of permanent alimony to the defendant in the sum of $2,500, nor the amount of child support. The court entered judgment in harmony with its findings.

Our statute (G. S. 1949, 60-1511) requires that when a divorce is granted by reason of the fault or aggression of the husband, the wife shall be restored to all the property, lands, tenements and hereditaments owned by her before her marriage or acquired by her in her

own right after the marriage, and not previously disposed of, and shall be allowed such alimony as the court shall think reasonable, having due regard to the property which came to the husband by marriage and the value of his real and personal estate at the time of the divorce.

In *Korber v. Korber*, 163 Kan. 685, 186 P. 2d 241, which dealt with the sole question of separately acquired property of the wife, it was said:

". . . Gifts to the wife, from her husband to say nothing of those received from others, become her separate property under the statute. (G. S. 1935, 60-1511; *Mann v. Mann*. 136 Kan. 331, 15 P. 2d 478; *Davison v. Davison*, 125 Kan. 807, 266 Pac. 650.)" (l. c. 688.)

While a division of property is largely in the discretion of the district court, such discretion cannot be used arbitrarily. The discretion vested in the district court must be exercised in wholehearted good faith and be guided by the statutes, not by the court's private opinion of what the statute ought to be. Where the discretion is arbitrary and not judicial, and the judgment is inequitable, it will be set aside. (*Davison v. Davison*, 125 Kan. 807, 815, 266 Pac. 650; *Mann v. Mann*, 136 Kan. 331, 15 P. 2d 478; *Garver v. Garver*, 184 Kan. 145, 334 P. 2d 408; *Nichols v. Nichols*, 186 Kan. 295, 349 P. 2d 929.) There is no rule of law for determining what proportion of the husband's estate should be set apart to the wife, but this court has suggested that there are many cases in which one-half of the estate would be a proper allowance. (*Mann v. Mann*, supra.) Under the authorities cited, the district court was required to restore to Mary all the property she acquired in her own right after the marriage, by inheritance, gifts or otherwise. That consisted of the savings account, one-half the value of the home place, and the value of the gifts received from her relatives.

Considering the facts and circumstances as disclosed by the evidence, we are of the opinion the district court abused its discretion with respect to the allowance made to Mary as permanent alimony in the sum of $2,500. That sum was plainly unreasonable and inadequate. Nothing would be gained by remanding this case for a new trial, and this court is of the opinion the evidence justifies an award to Mary as permanent alimony in the amount of $16,000 in addition to the $2,500 awarded her in the final decree. We affirm the district court's judgment awarding the home place and furnishings to Mary and the other real and personal property to August,

and direct that it enter judgment in favor of Mary in the total sum of $18,500 as permanent alimony. To effectuate payment of the $18,500 permanent alimony judgment, the district court is further directed to make said sum a lien upon the real and personal property separately decreed to August and direct that said amount be payable immediately by the sale of said property to satisfy the lien given by this judgment.

It is so ordered.