No. 46,686

J. Wesley St. Clair, *Appellee,* v. Gloria L. St. Clair, *Appellant.*

(507 P. 2d 206)

Opinion filed March 3, 1973.

*Thad E. Nugent,* of Overland Park, argued the cause, and *James D. Howell, Jr.,* of Overland Park, was with him on the brief for the appellant.

*Sheldon M. Crossette,* of Cooke, North, Crossette & Dickson, of Prairie Village, argued the cause, and *A. C. Cooke,* of the same firm, was with him on the brief for the appellee.

The opinion of the court was delivered by

SCHROEDER, J.: This is an appeal by the wife in a divorce action from a judgment of the trial court granting the husband a divorce, making a division of property, and granting custody of the children to the husband. The wife's cross-petition for divorce and child custody was denied.

The wife appeals contending the trial court erred: (1) in awarding custody of the two infant sons to the husband; and (2) in making an inequitable division of the property accumulated by the parties since the marriage.

J. Wesley St. Clair (plaintiff-appellee) and Gloria L. Fouser (defendant-appellant) were married to each other in Kansas City, Missouri, on September 16, 1960.

At the time this action was filed on April 3, 1970, J. Wesley St. Clair was president of the Southgate State Bank and Trust Company of Prairie Village, Kansas. This bank is located on a 10 acre tract and it is described in the record as the Nation's first financial supermarket, which represents a new concept in one-stop shopping for financial services. The bank was established December 11, 1956, and it experienced a phenomenal growth in deposits over a thirteen year period from approximately $1,000,000.00 to $36,777,915.26 as of June 30, 1970. Wesley's "family holdings in the bank is in the area of 40%."

470

The parties met in 1958 at a church sponsored Christmas caroling event and after a courtship of moderate length were married. Two sons were born to Wesley and Gloria, the first on June 9, 1962, and the second on June 25, 1966. The trial court found that neither Wesley nor Gloria brought substantial assets into the marriage.

At the time this divorce action was filed Wesley was thirty-four years of age and Gloria thirty-eight years of age. Wesley was a graduate of the University of Kansas with a Bachelors Degree. While he attended school he worked at the Baltimore Bank and Trust Company of Kansas City, Missouri, in various positions learning the banking business. On graduation from college, and after a six month training period in the United States Army, he commenced working for the Southgate State Bank of Prairie Village with a salary of approximately $400 per month. Since that time he has worked his way up in the Southgate State Bank to the position of president, and he is also vice-chairman of the Board of the Ranchmart State Bank. He derives income from salaries from the two banks, from commissions paid to the officers of said banks from credit life insurance sold and from a partnership called Southgate-Palmer Insurance Agency. In addition, over the years he has had some capital gains from trading in stocks, particularly in the years of 1968 and 1969.

The income of Wesley from the foregoing sources has risen from $14,540.34 in 1961 to $95,465.82 in 1968 and $86,337.38 in 1969.

Gloria was the daughter of a lower middle class Iowa farm family. She graduated from high school as valedictorian in her class and attended a State Teacher's College for two years. After leaving college she held several positions from the year 1951 to a time shortly prior to her marriage in 1960 in the capacity of clerk-typist and stenographer. Immediately prior to the marriage she was employed as a stenographer at a Kansas City, Missouri, bank. Since the marriage Gloria has been a housewife, and she has not had any employment outside the home. At the time of marriage she was experienced in taking shorthand and in the use of manual and electric typewriters, dictating equipment and other secretarial equipment. Her last salary when she was employed was approximately $340 per month.

Wesley's complaints about Gloria concerning her performance as a housekeeper and her lack of pep began with the marriage. Gloria on the other hand contends their difficulties began with the birth

of the first child. When Gloria returned home from the hospital with her new child she found Mrs. Baxter had been hired by Wesley, at his mother's suggestion, to take complete charge of the house and the new baby. Six weeks later when Mrs. Baxter departed, Wesley complained that his wife did not keep the house clean, that she ate out too frequently, that she did not entertain Wesley's parents, that she stayed up too late at night and stayed in bed too long in the morning, that she was too slow in getting prepared for trips and was not punctual, that she saved too many items which Wesley categorized as "trash", and that she was generally not communicative.

Upon the hospitalization of Gloria for the birth of the second child in 1966, Wesley, during Gloria's absence and without her knowledge and consent, brought his mother and sister together with some employees from the bank into the house and completely cleaned out the house, removing all of the accumulations of items saved by Gloria.

Gloria asserts the ritual cleaning of the house by Wesley and his family and employees during her absence occurred twice thereafter, the first while she was hospitalized in St. Marys Hospital in Kansas City in 1968, and subsequently while she was hospitalized for psychiatric care in Menorah Hospital in 1969.

Wesley contends these "ritual cleanings" resulted in the removal of filth, mold, dirty clothing, tissue paper and dead flowers (which had been arranged in a casket-like image in the bathtub), spoiled food and molded clothes in the refrigerator, soiled kleenex, soiled sanitary napkins lying in the bathtub and wrapped in shirts on appellant's closet shelf, women's undergarments covered with diarrhea and vomit stains and sacks full of soiled ladies lingerie, the removal of mildew from the walls of the master bedroom and sacks of trash, which amounted to two tons of waste paper on each of two occasions.

Briefly summarized the record disclosed Wesley is a perfectionist obsessed with keeping things straightened up and in order, and Gloria is an untidy housekeeper who compulsively likes to hoard things.

The voluminous record presented on appeal in this case consists of 394 pages. The case was tried in December, 1970, and had the dubious distinction of becoming the longest contested divorce trial in the history of Johnson County. Of the thirty-five witnesses that

testified at the trial one was the family doctor, two were clinical psychologists and four were psychiatrists.

Before the trial court heard testimony in the case, it indicated a need for professional advice from various medical specialists concerning the psychological and psychiatric aspects of the case. The court stated it would rely heavily upon the opinions of such specialists. Dr. Robert Terrill, M. D. was appointed as the court's neutral psychiatrist, because he had both the background of the St. Clair family and had been in consultation with both of the parties. Dr. Terrill executed and acknowledged the affidavit upon which the court relied to place temporary custody of the children with Wesley when the divorce action was filed.

Gloria waived any privileged communications she had with doctors who were to testify in the case.

Coincidental with the hospitalization of Gloria in the Menorah Hospital for psychiatric treatment in October of 1969, Wesley moved the family into a new home on 101st Street in Leawood, Kansas. At this time the relatives and employees of Wesley undertook their last cleanout of the 93rd Street residence in Leawood. During this cleanout Wesley brought Gloria's psychiatrist, Dr. Terrill, to the 93rd Street property to provide him with a view of the disorderly condition of the premises.

Upon her release from the hospital, she went to the new home to find that again during her absence Wesley had hired a fulltime housekeeper.

At the trial Wesley testified Gloria did take the children to school, gave them birthday presents and parties, Easter remembrances and celebrated Christmas with the tree. He said that early in 1970 she was improved and had more activities, that she then started to slip back and it was during this time that he gave her another chance, following intimate relations they had together in January, 1970.

On March 19, 1970, the family went to Phoenix, Arizona to spend the Easter vacation. On the previous day, March 18th, Wesley requested Gloria to sign some papers at the office of A. C. Cooke, Wesley's attorney. Gloria testified the papers she signed were described as having something to do with voting rights in the bank, whereas they were in fact a post-nuptial agreement. The other document Gloria signed on that day was a deed to the 93rd Street residence. The post-nuptial agreement was drafted by Mr. A. C. Cooke.

The trial court, after hearing the case, set the post-nuptial agreement aside on the ground that it was not knowingly and understandingly executed by Gloria. The trial court specifically found *the agreement failed to contain an itemized listing of the parties' respective properties along with the values thereof* and, although Gloria had a general knowledge of their properties, she did not know the precise nature and extent thereof or the values of such properties. The trial court also found Gloria executed the agreement without obtaining independent legal advice, even though Mr. Cooke had given her the names of five attorneys in the general practice of law in Johnson County, Kansas, that she could contact for such advice.

Shortly after the family's arrival in Phoenix, Arizona, Wesley indicated to Gloria that he would have to return to Kansas City on business, which he did alone, leaving Gloria and the children in Phoenix. On Wesley's return to Kansas City he discussed the institution of divorce proceedings with his attorney, with Gloria's psychiatrist, a minister and the family doctor. The purpose of the trip was concealed from Gloria.

After the return of the family to Johnson County, Wesley on April 3, 1970, asked Gloria to have lunch with him on the Country Club Plaza in Kansas City. While Gloria was absent from the home, Mary Frances Kearney, Wesley's administrative assistant, went to the home on Wesley's instruction, gathered up Gloria's clothing and drove Gloria's automobile to Oak Hall, an apartment house on the Plaza, where Wesley had rented an apartment for Gloria on the top floor of the building. After Wesley and Gloria had lunch, Wesley took Gloria to the offices of her psychiatrist, Dr. Terrill, and in Dr. Terrill's presence told her on that morning he had filed suit for divorce, that he had further obtained an ex parte order to remove her from the house and an ex parte order for the custody of the children to be placed with him. Immediately after the announcement in Dr. Terrill's office, Wesley took Gloria by a chauffeur-driven limousine to the office of his attorney, Mr. Cooke. They entered Mr. Cooke's office through a back door on the alley. Gloria was there served with the divorce papers, and she signed an entry of appearance. Thereafter she was placed in the limousine and transported to the Oak Hall Apartments. Simultaneous with the Plaza luncheon and the removal of Gloria's personal effects from her home by Mary Frances Kearney, Wesley had the home telephone number changed to an unlisted number which was not made known to

Gloria. An answering service was later substituted for the unlisted number, all of which effectively removed the possibility of any unsupervised contact between Gloria and her children.

Under the foregoing circumstances the litigation was initiated on April 3, 1970. Thereafter Gloria employed counsel and on April 10, 1970, her entry of appearance was filed along with combined motions for support money, attorney's fees pendente lite, restraining orders, visitation and a separate motion for change of venue. She also filed her answer and cross-petition for divorce. The trial court heard the motions for visitation and support on April 14, 1970. It set one midweek visitation and one overnight visitation on Friday or Saturday night as a schedule that would guarantee reasonable visitation to Gloria.

On the 20th day of April, 1970, the trial court heard the other motions. The trial judge stated he was personally acquainted with both parties litigant, but did not consider himself prejudiced and denied the motion for change of venue. Wesley also raised objections to the visitation schedule previously entered by the court, and while the court allowed the schedule to stand, it did give Wesley the right to have a "nominee" of his choice present to look upon Gloria at times when the children were with her. Gloria moved the court to allow a "nominee" of her selection to be present when the children were with Wesley, but this request was denied. Gloria's motion seeking to restrain Wesley from taking the children on trips out of the state, when accompanied by his administrative assistant, was denied. Numerous other motions were filed by the parties regarding psychiatric examinations and evaluations and the production of medical and hospital records.

In view of the financial disparity between the parties Gloria moved the court for the allowance of sums with which to employ and compensate experts necessary for the preparation of her case. The court refused to allow money for such purpose, indicating that a reasonable fee allowance for experts would be considered at the time of trial.

After a stormy discovery period the matter eventually came to trial on December 1, 1970.

The trial court after hearing the evidence filed a memorandum decree on January 4, 1971, wherein it made numerous findings of fact and conclusions of law. The uncontroverted facts heretofore related, giving the background of the case, have been taken primarily from the trial court's findings.

The trial court recited in its findings that the temporary custody of the minor children of the parties was granted to Wesley based upon the affidavit of Robert S. Terrill, M. D. and that the children have resided with Wesley since that time. The trial court further found that since entry of the order on April 3, 1970, for temporary custody, no motion for change of custody "has been filed by defendant, and when the trial of this matter was first set for August 10, 1970, it was continued at the request of defendant's counsel and when set for September 28, 1970, was continued at the request of defendant's counsel."

Based upon the past earnings record of Wesley, as heretofore recited, the trial court projected Wesley's future income to be between $60,000.00 and $85,000.00 a year in its findings. The trial court found that the parties accumulated properties and incurred liabilities during their marriage as follows:

"The court hereby incorporates the entirety of Plaintiff's Exhibit No. 17 into these findings by reference as if same is fully set out herein as the assets accumulated and the liabilities incurred by the parties during the marriage. The court directs that a copy thereof be prepared and be attached to this Decree by the Attorney directed to prepare the Journal Entry. The Court finds that the net worth of the Plaintiff and Defendant, after the inclusion of the liability of $15,000.00 to the Defendant from said report, to be the sum of $132,972.64. Included in the assets is the sum of $23,922.53 which represents an interest of Plaintiff in the Southgate State Bank Profit Sharing Plan, which Plaintiff has no access to until he leaves the employment of the bank or dies. The major portion of the assets are stocks in the Southgate State Bank and Trust Company and the Ranchmart State Bank which stocks are encumbered for large loans to various banks in the greater Kansas City Area. The Plaintiff is the owner of 2.3% of the stock at the Southgate State Bank and Trust Company and approximately 16% of the stock of the Ranchmart State Bank."

"Plaintiff's Exhibit No. 17" is a financial statement dated November 14, 1970. It consists of six pages of financial data, the first page of which is addressed to Mr. J. Wesley St. Clair by G. Samuel Clough of Brown and Clough, Certified Public Accountants. The prefatory statement of Mr. Clough reads as follows:

"We have prepared the enclosed personal financial statement and other related schedules as of November 14, 1970 from records and other information received from various sources.

"*Inasmuch as we did not perform all of the generally accepted auditing standards in the preparation of these statements and schedules* and in some cases the figures presented in the schedule of monthly expenses are estimates based on actual expenditures for the period from October 1, 1969 thru September 30, 1970, *we do not offer an opinion concerning them.*" (Emphasis added.)

The Exhibit lists the current assets at $11,217.31; investments in accordance with schedule A of $163,424.91; real estate consisting of the residence at 101st Street in Leawood, Kansas, at a cost of $87,500; personal property of $18,725.00 and other assets in the total sum of $84,151.13. Among the other assets listed is Southgate-Palmer Insurance Agency—a partnership, in the sum of $586.94. Wesley testified the Southgate-Palmer Insurance Agency was a partnership in which he personally owned a fifty per cent interest, and from which he derived an income of over $25,000.00 in 1968 and over $25,000.00 in 1969. He also testified over eighty per cent of the business of this insurance agency was derived from the bank.

Also among other assets is listed the Southgate Profit Sharing Plan—Vested Interest, in the sum of $23,922.53; a one-third beneficial interest in Leawood Heritage Trust valued at $5,069.09; a one-half beneficial interest in Ranchmart State Bank Trust valued at $54,572.57.

Wesley testified the Southgate Life Insurance Agency is another insurance agency in which he has an interest, that it is directly related to the Southgate State Bank, but he contends it has no value. It has not been listed in "Plaintiff's Exhibit No. 17" as an asset.

The grand total of assets shown is $365,018.35. Liabilities and net worth are listed as follows: Accounts Payable $24,928.34; Notes Payable $164,105.34; Mortgage Payable—Residence $58,012.03; Net Worth $117,972.64 making a total of $365,018.35.

In the schedule of investments common stocks are listed, including 921 shares of Southgate State Bank and Trust Company—at book value $61,869.10, and 1600 shares Ranchmart State Bank—at book value $81,148.80.

It is apparent the trial court in its findings rejected "Exhibit S" prepared by Mr. Napshin, a certified public accountant employed by Gloria to make a financial statement of Wesley's net worth. "Exhibit S" is dated April 15, 1970, and gives Wesley's net worth at $484,083.94. Mr. Napshin listed the Southgate-Palmer Insurance Agency assigning it a market value of $209,397.50 based on 10 times average annual earnings for the past three years. He listed the 921 shares of Southgate State Bank stock owned by Wesley at $93,545.97, and the 1600 shares of Ranchmart State Bank owned by Wesley at $118,512.00.

The trial court specifically found the needs of Gloria to maintain and continue her station in life to be $984.00 per month.

Other specific findings pertinent to this appeal are as follows:

"16. The general physical and mental health of the Plaintiff and the minor children of the parties is good.

"17. The general physical health of the Defendant is good, but the evidence discloses that *the Defendant has had emotional and mental health difficulties for some period of time as follows:*

"The Court has caused the suggested findings of the Plaintiff to be filed in this cause along with the suggested findings of the Defendant. The Court has read them very carefully *and finds that the suggested findings of Plaintiff relative to the emotionanl and mental health of Defendant in suggested finding No. 16 to be well founded in the evidence* with one exception *and the court hereby adopts the entirety thereof or Suggested Finding of Plaintiff No. 16, paragraphs (a), (b), (c), (d), (e), (f), (g), (h), (i), (j), (k), (l), (m), (n), (p), (q), (r), (s), (t), as the findings of the Court relative to the emotional and mental health of the Defendant,* and said findings are incorporated herein by reference as if fully set out herein. The court excepts therefrom paragraph 16 (o).

"18. The Plaintiff has generally performed the duties devolving upon him as a husband; he has shown concern, patience, understanding and remained optimistic about the Defendant's condition and worked *for her recovery* by making domestic help available which was refused in whole or part by Defendant and who took Defendant on numerous trips and had the house cleaned up with the hopes that the Defendant would be rested up and be able to take over her household duties with a new start, but the Defendant in disregard of her marriage vows and obligations has committed several indignities to the marital relation, to wit:

"(*a*) She has generally failed to prepare meals. for the Plaintiff or the minor children on many occasions.

"(*b*) She has failed to keep the home of the parties clean and in order.

"(*c*) She has failed to launder the clothing of the Plaintiff or the children and has allowed the bed linens of the parties and of the children to become dirty and soiled without changing same.

"19. The Plaintiff is a fit and a proper person to have custody of the minor children of the parties, and that he has demonstrated love, affection, devotion, supplied the physical and mental needs of the children, has arranged his business to be at home with them as much as possible, has seen to their hygenic needs and the spiritual training and educational guidance and has testified that he will continue to do so in the future, *but the Defendant has not shown and does not show ability to care for such children in the following respects:*

"*The Court hereby adopts by reference paragraph No. 18 (a), (b), (c), (d), (e), (f), (h), (i), (j), (k), (l), (m), (n), (o) and (g) with the deletion of the first sentence therein as the findings of the Court herein and said finding is incorporated herein by reference as if fully set out herein.*" [These were the requested findings of Wesley]. (Emphasis added.)

In disposing of this case the trial court decreed:

"(Decision Of The Court)

"Section 1. (Divorce)

"The Plaintiff, J. Wesley St. Clair, is granted a decree of divorce from the Defendant, Gloria L. St. Clair, on the grounds of gross neglect of duty and the Cross-Petition of the Defendant is denied.

"Section 2. (Custody of Children)

"The Plaintiff is granted the care, custody and control of the minor children of the parties subject to reasonable visitation of the Defendant. This order shall be subject to further order of the Court upon proper change of circumstances in the best interests and welfare of the said minor children.

"Section 3. (Division of Property)

"(*a*) The Postnuptial agreement of the parties is not approved by the court for the reason that Defendant did not knowingly and understandingly execute and enter into said agreement pursuant to the law of Kansas.

"(*b*) In General. The Court finds, after due and careful consideration of all the factors and the evidence herein, that the Plaintiff and minor children need those assets that are peculiar to his employment and those that will provide the maximum of security and shelter. That the Defendant will need the personal property she has in her possession and sufficient income to provide for her security, shelter and environment for good visitation with said minor children.

"(*c*) As a division of the property of the parties, the following property is set aside to the Defendant as her separate property, free and clear of any right, title or interest of the Plaintiff, to-wit:

"1. The Cadillac automobile in her possession.

"2. All household furniture in her present apartment.

"3. All personal effects in her possession.

"4. The sum of Twenty Thousand ($20,000.00) Dollars to be available and provided on or before July 1, 1971.

"(*d*) As a division of the property of the parties, the remaining property of the parties not mentioned in paragraph (*c*) herein, is set aside to the Plaintiff as his separate property, free and clear of any right, title or interest of the Defendant, and Plaintiff shall assume and pay any liabilities thereon and save Defendant harmless from any obligation thereof.

"Section 4. (Alimony)

"Defendant is awarded future support denominated as alimony in the sum of $1,000.00 a month and same shall terminate upon the death or re-marriage of Defendant.

"Section 5. (Insurance)

"The Plaintiff is ordered to keep and maintain the policies of life insurance on his life with the same beneficiaries thereunder as security for the future support to Defendant as herein ordered and in the event of the death or re-marriage of Defendant this order shall cease.

"Section 6. (Hospital and Medical Insurance)

"Plaintiff is ordered to keep and maintain hospitalization and medical care insurance on the Defendant and the minor children and shall supply the Defendant with a copy of said policy upon reasonable demand.

"Section 7. (Attorneys Fees)

"Mr. James D. Howell, Jr., Attorney for Defendant, is allowed a professional fee of $12,500.00, $2,500.00 of which has already been paid, and Defendant is granted judgment against Plaintiff for said sum.

"Section 8. (Expenses of suit)

"The court finds that the expenses incurred by the parties in this litigation

should be paid by the Plaintiff, but that the exact amount of same and the proper approval thereof by the court will require a hearing with counsel or with counsel and the parties and an order thereon is not made at this time."

The appellant first contends the trial judge abused the exercise of his power of discretion in granting custody of the minor children to the father, when the consensus of the expert testimony indicated the best interests of the children could best be served by placing them in the custody of the mother. And secondly, the appellant contends it was an abuse of judicial discretion to find in the absence of substantial evidence that the father had the ability to provide the essential environment for children of tender years.

Before discussing the evidence and the specific findings of the trial court pertaining to the custody of the minor children, it would be well to review the applicable law.

When the issue of child custody is between the parents, the paramount consideration of the court is the best interest and welfare of the children, and in the absence of abuse of sound judicial discretion, the trial court's judgment determining the issue will not be disturbed on appeal (*Gardner v. Gardner,* 192 Kan. 529, 389 P. 2d 746; *Greene v. Greene,* 201 Kan. 701, 443 P. 2d 263; and authorities cited in these opinions.) However, where an abuse is affirmatively shown in the record, this court has not hesitated to reverse, modify or otherwise change the order of the trial court. (*Wilkinson v. Wilkinson,* 147 Kan. 485, 77 P. 2d 946; *Lindbloom v. Lindbloom,* 177 Kan. 286, 279 P. 2d 243; *Jackson v. Jackson,* 181 Kan. 1, 309 P. 2d 705.)

It is an elementary rule in this state that if children are of tender age they almost of necessity must be entrusted to their mother's care, without weighing unduly what may be some possible short comings in her character or conduct. (*Janney v. Janney,* 159 Kan. 230, 154 P. 2d 131 and *Adkison v. Adkison,* 206 Kan. 125, 476 P. 2d 216.)

Dr. Terrill, selected by the trial court to be the neutral phychiatrist, had three years of residency at the Menninger School of Psychiatry. He practiced the medical speciality of psychiatry for twelve years. He testified that in the past several years he had become acquainted with Gloria and Wesley. He first saw Gloria at St. Marys Hospital on January 24, 1968, in consultation *at the request of her physician Dr. Frank O'Connell..* Wesley pointed out to him the problem areas of his wife in that she was slow in making decisions, tired a lot, had difficulty in keeping up the house work

and would let things accumulate. During the time he was treating Gloria he was communicating and in association with Wesley as it pertained to the children. He was given the history of Gloria through her husband so that he could compare her life to that which he was seeing in consultation and evaluation. Wesley indicated to Dr. Terrill that sex was not a problem since he was too busy with the bank work and didn't have much sex drive. In Dr. Terrill's initial interview with Wesley, his only complaint about his wife's care of the children was that she could not seem to show much physical affection for them and this was the only reference to anything about the children. Dr. Terrill's next interview was February 2, 1968, and the only thing of significance was that he felt Gloria did not see much need for psychiatric help. Dr. Terrill saw Gloria on an out-patient basis through the year 1968. On January 10, 1969, when the parties saw Dr. Terrill, Wesley was dissatisfied about things at home and indicated that Gloria was slipping by again letting things accumulate, sleeping late and staying up late, or a general dissatisfaction with her function. He made no complaint to Dr. Terrill at that time relative to her care or treatment of the children. Gloria's answer to her husband's complaint was that she desired to take over, and didn't want her parents at the house as much, but didn't want to hurt their feelings. She said that Wesley was too critical and impossible to please. Dr. Terrill reported that on March 7, 1969, Gloria was making more effort to take responsibility and make decisions. On May 23, 1969, she was concerned about moving and the responsibilities associated with the new home, although Wesley had contracted with a decorator to "do it up right". On later visits with Gloria, Dr. Terrill said she appeared tense, with pressure increased over the activities associated with moving. She felt she was spinning her wheels. She was unable to do the things expected of her. At that time Dr. Terrill felt she needed a hospital environment where she could express her feelings and gain confidence by removing her from the stressful environment. At the request of Wesley, Dr. Terrill viewed the condition of the house on 93rd Street in Leawood, which was unoccupied at the time because the parties had already moved. He observed a lot of clutter, paper bags, clothes, dirty dishes, newspapers and magazines. While he was in the bathroom he recalled clutter but he did not recall Wesley pointing out anything relative to the tub. His observation at the home influenced Dr. Terrill's

diagnosis of her problem of obsessiveness and her difficulty in making a decision. Dr. Terrill said Gloria had the feeling of pressure and uncertainty as to which things were important and which things were not. It was of significance that Gloria's compulsive nature was related to her husband's personality in that she was unable to please him no matter what she did, and as a result was paralyzed in making decisions. As a result of this feeling of not being able to do the right thing or to be unsure of one's self Dr. Terrill admitted Gloria on October 22, 1969, to Menorah Hospital for evaluation and therapy. She was hospitalized from October 22, to November 22, 1969, with therapy designed to elicit feelings from her whether anger, resentment or happiness. As a result of the treatment she blossomed and showed more interaction with people, confidence and she was more at ease. At the time of discharge Wesley had apparently made up his mind that despite what changes Gloria was making, he was losing feeling for her and he was doubtful the marriage could continue. Wesley doubted that Gloria would maintain improvement once she left the hospital, according to Dr. Terrill. Thereafter Gloria's out-patient therapy was scheduled four mornings a week. She continued to improve by showing confidence and a desire to make changes to improve the marriage. She indicated her husband was very cool and distant without encouragement in those things where she had improved or in those areas where she showed him she was trying.

On January 8, 1970, Wesley talked to Dr. Terrill alone and indicated that while Gloria was better, she was falling short in many areas and not meeting his requirements or what he expected of her. On January 16, 1970, Dr. Terrill saw them together and Wesley was more dissatisfied about the way things were going with more talk of divorce and he did not see how he could go on. According to Dr. Terrill, on January 30, 1970, Gloria was frustrated from being unable to make Wesley see she was making an effort to improve and nothing could convince him. On March 12, 1970, Dr. Terrill saw Wesley alone and he continued to feel his wife was not functioning properly and Wesley admitted his complaints were not of great significance. Wesley's feeling was that it was hopeless.

On March 27, 1970, Wesley called Dr. Terrill and advised that he would be in town for another day and wanted to see Dr. Terrill, that he had returned from Arizona and was going back the next evening. Wesley said he was having the same problem, that Gloria

was sleeping too much while in Arizona; that she wasn't doing things with the boys—that is, not swimming, giving them baths, or keeping them clean and generally was not showing much feeling for them. Dr. Terrill said that in all of his consultations with Wesley, it was only very infrequently that he would mention Gloria's relationship to the children, that it was more often the house and her lack of keeping on schedules.

Dr. Terrill was responsible for having the temporary custody of the children placed with Wesley. On this point he testified:

". . . Mr. Cooke presented me with an affidavit he had prepared about the temporary custody of the children if a divorce was commenced and I felt the temporary custody should be with the father because Gloria wasn't prepared for a divorce. She didn't think it would come about and needed time to organize her thoughts and feelings. I thought the children would best remain with their schedule in the home. I did not tell Mr. Cooke what to include in the affidavit, I just wanted it stated it was a temporary arrangement. I had no thought at all at the time that I executed the affidavit about Gloria not being a fit and proper mother to have the custody of her children permanently. . . ."

Dr. Terrill related the events of April 3, 1970, which he described as significant because Wesley and Gloria were in his office, and Wesley told Gloria that he had filed for divorce and had custody of the children. Dr. Terrill then testified:

". . . Her response was shock, disbelief, but no real strong emotion except when he said that he wanted custody of the children and she said that she would not give up the children and that she would fight the custody of the children. He told of his plans to care for her with alimony and to set up an apartment. Her reaction was spontaneous that she would not give up custody of the children and that she would fight for them or do whatever was necessary to have the children. . . ."

Dr. Terrill continued:

". . . On April 13th, 1970, I found that Gloria was alert, composed and she was functioning well. On May 14th, she was more spontaneous than I had observed before and she was resigned to the fact that the marriage was over. From her release from the hospital in November of 1969, there has been a progressive increase in her self-confidence, spontaneity, and her level of functioning has improved gradually. By August 4, 1970, she was continuing to hold her own with no sign of any regression. Regression would be defined in this case as a slipping back to the old ways of withdrawing or not handling her affairs and shutting herself off from people. Since her release from the hospital in November of 1969, I have not been aware of any element of regression. *In my medical opinion, based upon reasonable medical certainty, I do not believe that this is likely to happen.* The reason for my opinion is that there has been a change in the environment and she is now out of the stressful situation where the demands were greater than she could cope with and she *is*

away from the inadequate feeling in the marriage situation. She is capable as shown by the accomplishments and rather than fall apart at the shock of the divorce, she arranged her own living quarters, furnished her apartment, handled business affairs, worked with people in a camp, has attended the court hearings which takes real strength and from the fact that its a year now without any evidence of regression. Which of these environments would be in the best interests of the children: A full-time mother or a father engaged in business who has hired a negro maid partial day and the balance of day a retired school teacher who has never married and never had any children? I feel that living with the mother would be preferable to the other arrangement. The reason for my opinion is that a paid person doesn't have the feeling for the children that Gloria has, and if she wanted out, she had ample opportunity. *I know there is nothing in her character that could in any way be detrimental to the children. She is a good moral person.*" (Emphasis added.)

On cross-examination by Mr. Cooke, Dr. Terrill testified,

". . . My diagnosis following hospitalization was that of passive aggressive personality or one who had difficulty in expressing anger in an open matter of fact way, but held it in. An example would be Wes telling Gloria to empty the waste can and her response—I will not do it because I am angry at him. I saw Gloria approximately once a month for a year and ten months and it is helpful to have a cooperative patient. She was not particularly happy about consulting. Before October 22nd, I discussed with Wes and you, Mr. Cooke, your recommendation and my recommendation that she be hospitalized. . . . From the time I have known Gloria she has legally been mentally competent. . . ."

Dr. Terrill concluded his testimony by saying the change we see in Gloria, her growth, development and blossoming is not attributable to a magic pill but is from within.

In the ordinary case on appeal where the trial court has made findings of fact, the record is reviewed to determine whether the evidence supports the findings, and if so the judgment will be affirmed if the findings of fact support the judgment. Technically, it may be said, the findings made by the trial court herein are founded upon evidence disclosed at some place in the record on appeal. But in our opinion, after a careful analysis of the entire record and a consideration of all the facts and circumstances presented by the totality of the record herein, application of the foregoing rule to the order of the trial court, awarding custody of the minor children of tender years to the father, must yield to overriding considerations presently to be discussed. A few examples taken from the trial court's specific findings will serve to illustrate the infirmity in the trial court's order and show what has actually occurred.

A resort to findings No. 17 and No. 19 will disclose the trial court adopted verbatim with only a few minor deletions, the requested findings of Wesley with respect to the crucial points in this case.

Among the findings adopted by the trial court in its finding No. 17 are the following:

"(c) That at such time Dr. Terrill had her psychologically examined by a psychologist, Mary G. Williams, Ph. D., whose report of January 25, 1968, was introduced in evidence (Exhibit No. 6), which report stated in part:

'The picture here is one of a woman virtually paralyzed by an extremely passive aggressive adjustment to life, all her productions are so meager and so constricted that, although one may suspect the presence of a more malignant process, there is no clear evidence in this material of any psychotic process.'

'The general character of her relationships is so shrouded in denial that her dislike of man is expressed only very indirectly. She tends to belittle them and all things masculine, and there is even a hint that she entertains some sadistic wishes to hurt them.'

Dr. Williams testified that this could be directed towards her sons as well as her husband.

"(d) At the time of this hospitalization in January of 1968, Dr. Terrill found that she was passive aggressive with some leaning towards psychosis. After her release from the hospital in January of 1968, Dr. Terrill saw her on a monthly basis until October of 1969. He testified that this therapy during this time was not of much value and she made no improvement.

"(e) Dr. Terrill also testified that her showing of little or minimal affect was apparently a life-long pattern.

"(f) Dr. Terrill admitted the defendant to the psychiatric ward of Menorah Hospital, Kansas City, Missouri, on October 22, 1969, where she remained until November 22, 1969. The hospital records show on the page entitled psychiatric admission order sheet as filled out by Dr. Terrill a tentative diagnosis of 'obsessive compulsive reaction. Possible schizoaffective.' Outstanding symptoms of 'unable to face responsibilities of being wife, mother, homemaker. Can't throw away anything and hoards everything.'

"(g) The defendant had over the years collected many newspapers, magazines and in addition collected trash and placed such trash in sacks and placed such sacks in the basement of the home. During the time she was in the hospital in June of 1966 when the second child was born, the house was completely cleaned out by the plaintiff, and others, and such trash and newspapers were thrown away and were hauled to a wastepaper company and were sold for two tons of wastepaper.

"(h) The house was again cleaned out when the defendant was in the hospital in January of 1968 at which time the trash and other wastepaper was again hauled away. The defendant herself testified that there was approximately as much hauled away at this time as there was in 1966. At this time the house was cleaned out by the plaintiff and Mr. and Mrs. Emmett Fouser, the parents of the defendant.

"(i) That approximately a month prior to her hospitalization on October 22, 1969, the parties had moved to a new house, but defendant was unable to part

with any of the trash, papers or other things she had collected nor could she move her clothing or that of the childrens and it was not moved until after she went into the hospital on October 22, 1969, at which time a third cleanout of the house was had. At this time according to the defendant's own testimony approximately the same amount of trash and newspapers were collected and thrown out, but according to the testimony of others there was a larger accumulation at this time."

It is to be particularly noted all of these findings pertain to conduct of Gloria prior to her hospitalization on the 22nd day of October, 1969. This hospitalization was under the direction and supervision of Dr. Terrill.

It is readily apparent the trial court rejected the testimony of Dr. Terrill concerning Gloria's progress after hospitalization and treatment for her mental illness late in 1969.

In making its specific findings the trial court also completely rejected testimony of Mary G. Williams pertaining to Gloria's mental condition after hospitalization for her mental illness late in 1969. In September, 1970, at the request of Dr. Terrill, Mary G. Williams re-examined Gloria as reflected by "Exhibit F" admitted into evidence. After two years and nine months, she found Gloria no longer had a dislike for men on comparative findings. She found no mental illness or psychosis, and in summary, made a finding of vast improvement by comparative tests. She found from tests administered in September, 1970, that Gloria's affect was healthy and that there was nothing in the 1970 findings to suggest a reoccurrence of her condition of 1968. *The result of the test on September, 1970, indicated there was no emotional problem for Gloria in her ability to love and care for the children.*

The report of Mary G. Williams dated September 10, 1970, states:

"The impression here is one of an essentially healthy woman. There is no evidence of pathology, psychotic or neurotic, in spite of her 'shock' over her marital situation and impending divorce.

"She has very good ego strength, a realistic outlook on life and good ability to assess her own strength and weaknesses. She is optimistic regarding her own chances for future happiness yet does not expect to be simply given to by the world. She knows she has to earn whatever she gets. She is not afraid to face herself and is very much aware of her own needs and feelings.

"Her pattern of relating to others are also healthy. Her first reaction to others is to be kind and understanding and her ethical standards are very high, so high that perhaps in this sense she is preoccupied with her children's future and concerned about their increased irritability, which she feels is generated by the uncertain marital situation. There is no evidence in this material of ambivalence or hostility toward either men or women, although as would be

expected she feels considerable anxiety concerning the custody case and questions her own past feelings of trust in her husband.

"The I Q on this date is 115. Her intellectual functioning is smooth and even, reflecting mature ego development. Abstract thinking and judgment are good and reality testing is sharp and clear. Her inner life is that of a very sensitive woman, one who is aware of the needs of others and of her own need to adjust to them. Affect is healthy and spontaneous and her ability to tolerate anxiety and maintain her defenses is above average, impulse control is mature.

"It is my impression that she would undoubtedly profit from supportive therapy only in times of stress and that she is well adjusted to her situation and the world in which she lives."

A similar psychological test report on Gloria's mental condition dated September 22, 1970, was submitted by Franklin C. Boraks, Ph. D. This report, the testimony concerning it and other similar testimony pertaining to Gloria's recovery as a result of psychiatric treatment were completely rejected by the trial court in making its findings.

In finding No. 19 the trial court specifically adopted the requested findings of Wesley. It found that Gloria "has not shown and does not show ability to care for such children in the following respects:

"(a) When the first child was born she would not care for the child whatsoever nor pick it up nor hold it or feed it, clothe it, bathe it for at least the first four to six weeks of its life and has never since that time fully performed the duties for such child as a normal mother would.

"(b) When she found out she was pregnant with the second child she stated that she was unable to take care of one child and would never be able to take care of two.

"(c) She has failed to clothe the children properly or keep the childrens clothing clean throughout the years.

"(d) She has failed to stay home with the children, but left the home for several hours each day and left the children with a babysitter, who provided all of the needs and wants of the minor cildren by playing games, reading and all other clothing, hygiene and other material duties which were not performed by defendant who also was observed to not do any of the foregoing.

"(e) She has not kept up the house and has allowed it to become filthy which is not in the best interest of the children.

"(f) She would leave the children for days at a time with her parents in a one room apartment on the Plaza area of Kansas City, Missouri, and, in fact, left the youngest there for several days when he was sick until the plaintiff made a definite demand and inquiry. It was not ascertained how sick he was and was taken straight from the apartment of the defendant's parents to the hospital where it was discovered that he had pneumonia."

Here again the material findings are supported only by evidence concerning Gloria's statements and conduct during the period of

time she was mentally ill, and prior to hospitalization on October 22, 1969.

A case in point at this juncture is *Lindbloom v. Lindbloom*, 177 Kan. 286, 279 P. 2d 243. There, as here, the wife was under psychiatric care. In both cases the wife was hospitalized for treatment on more than one occasion. (Here Gloria's first hospitalization in 1968, which she said was for physical reasons, resulted in a diagnosis of no physical ailment. Her complaints were the result of mental disturbance.) In each case the wife's housekeeping skills and efforts were the bases of the husband's action on legal grounds. The parallel continues in that the husband in each case spirited his wife into the State of Missouri, deprived her of contact with the children and indicated to her that he had made arrangements for them to be raised by other persons. In each case there was a clear indication in the record of the husband's plan to sever and destroy any relation between the mother and the minor children. The testimony in *Lindbloom* was that the mother was influenced by an illness which affected "the emotions and the moods". The finding of the trial court in the present case was that "the defendant suffered from emotional and mental health difficulties" which prevented her from performing her duties. In *Lindbloom* it was held the trial court erred in granting the husband a decree of divorce from the wife on the ground of gross neglect of duty, when the evidence disclosed that the wife had been hospitalized for mental illness in the fall of 1951, in the winter of 1952-1953, and in July of 1953, and when the acts complained of took place between her hospitalizations. The court said:

". . . When parties are married they take each other for better or worse. If the wife should become ill of tuberculosis, cancer, or any other disease, and be unable to perform her household duties as well as she ordinarily would perform them, we would not be willing to say that the husband was entitled to a divorce because of that situation." (p. 296.)

On appeal the court also reversed the trial court's order granting custody of the three children of tender years to the father by giving the mother custody, and by granting the wife's petition for separate maintenance.

The court relied upon *Lindbloom* in *Crosby v. Crosby*, 186 Kan. 420, 350 P. 2d 796, to set aside a divorce on the ground of gross neglect of duty, where the conduct complained of by the husband resulted from the mental illness of the wife on all dates material

to the litigation. (See also *Crosby v. Crosby*, 188 Kan. 274, 362 P. 2d 3.)

*Lindbloom* teaches that conduct of a wife attributable to mental illness cannot be asserted as the basis for granting a decree of divorce to the husband on the ground of gross neglect of duty.

By analogy the rule of *Lindbloom* and *Crosby* has application to the instant case. As in *Lindbloom* and *Crosby* the wife here was never legally adjudicated incompetent, but the conduct concerning which the husband complained occurred during a period when the wife was mentally ill. The bizarre behavior of Gloria, which the trial court made the basis of its specific findings, occurred between the hospitalization of Gloria in January, 1968 and the subsequent hospitalization of Gloria in October, 1969.

Although the rule in *Lindbloom* and *Crosby* was applied in determining the issue of divorce between a husband and wife, it has application to the issue of child custody as between parents in a divorce action. Where the record discloses the testimony of various witnesses in a divorce action is taken at face value by the trial court concerning the statements and conduct of the wife during a period of mental illness, and is made the basis of specific findings by the trial court to award custody of the children of tender years to the husband, the systematic rejection of the testimony of the same witnesses by the trial court concerning the improved mental health of the wife following hospitalization and psychiatric treatment for her mental illness indicates an abuse in the exercise of the trial court's power of discretion.

We are not unmindful of the rule which permits the trier of the facts to determine the weight and credit to be given the testimony of each witness. If the trial judge, where the case is tried to the court, finds that any witness has willfully testified falsely concerning any material matter, he has a right to distrust the testimony of that witness in other matters, and he may reject all or part of the testimony of that witness, or he may give it such weight as he thinks it deserves. But he should not reject any testimony without cause. (See, PIK Civil, 2.20 and 2.24.) Here, however, the trial court's findings disclose a systematic rejection of evidence geared to a chronological time sequence. That is, testimony of all witnesses pertaining to the wife's conduct prior to hospitalization and treatment was made the basis of specific findings adverse to the wife, whereas the testimony of the same witnesses, including the

neutral psychiatrist appointed by the court, disclosing the wife's marked improvement and recovery from the mental illness, after hospitalization and treatment, was rejected. This does not indicate the trial court is weighing the credibility of the testimony of the witnesses.

In determining that which is in the best interest and welfare of the children on the issue of child custody between the parents, the record discloses the following competent evidence.

Wesley employed Richard E. Davis, M. D. to test the boys' psychological health. *Dr. Davis in his report indicated the two boys were examined psychologically by Dr. Franklin C. Boraks,* who found them shy, emotionally immature, confused about mother figures, sad and angry, which is consistent with a troubled home situation.

*Dr. Boraks* is a clinical psychologist specializing in children. After examining the two boys *he testified* that Kenneth St. Clair, the younger boy, *needed mothering and that his mother's absence* created a great deal of confusion and turmoil within him. His examination of the older boy, John, revealed a child in depression, *in his longing for mother,* and the feeling of emptiness. The witness testified that he was struck by how sad and depressed the boys were and that they appeared to him in their behavior as children undergoing emotional deprivation. *Dr. Boraks' ultimate opinion was "these kids need a mothering figure, not a substitute."* Dr. Boraks further repudiated the contentions of Wesley that the children were happier after the separation than before by testifying that the test results and the results of his observation and examination of the boys are not compatible with a situation of maternal abandonment or indifference that Wesley seeks to establish.

It is noteworthy the examination by Dr. Boraks was the result of Wesley's efforts to have the boys psychologically examined.

Dr. Boraks did psychological testing not only on the two boys but also on Wesley and Gloria. He said the battery of tests he gave tell the fabric of a personality, its nature and its function; that it is the best tool we have to study the emotional life of an individual. In lay terms Dr. Boraks summarized the results of those tests. As a result of testing Gloria on *September 22, 1970,* he found she had no mental illness in that she has a capacity to see and appreciate those things which are going on around her. He said her judgments and thinking are governed by logic and the quality of her thinking

is free from internal interruptions which we associate with mental illness. He found no signs of schizophrenia or any undue anxiety and her adjustment did not have any signs of unusual stress to it. He related that her personality does have some unwanted ideas which he called obsessive compulsive and which is present in all personalities to different degrees. He found the obsessive compulsive trait present in Gloria in appropriate degree but showing difficulties on her part in being able to express her feelings freely, or if you will, an inhibition of affect, which she is aware of and for which she has insight. This awareness comes about by reason of her psychiatric treatment he testified.

On the same day Dr. Boraks gave the same projective battery of tests to Wesley. He testified that his findings revealed that there were no major mental disturbances. That Wesley is organized in a manner that inhibited free expression of affect and impulse and this, interestingly enough he described, is almost the same as for Gloria. That his personality was constricted and rigid and lacks freedom. That he pushes feelings out of awareness. His emotional warmth in emotional relationships is limited. He has feelings of inadequacy that he covers over.

Dr. O'Connell the family physician who referred Gloria to a psychiatrist said there was no lack of affection for the children by Gloria but a lack of affect.

Dr. Wayne Hart a specialist in child psychiatry saw Wesley and Gloria at the request of Dr. Terrill for the purpose of evaluation concerning their adequacy as parents. He saw the parties in August and September of 1970 and testified that Gloria had no symptoms of emotional illness, but that she was a shy person, and as time went on the shyness dissipated and he found her to be a warm individual. He described Gloria's personality trait as one of obsessiveness and Wesley's as one of rigidity, or one with more emphasis on facts than upon sensing the feelings of others. These traits he said all relate to child development. He referred to the symptoms of stress on the trait of Wesley as those which would produce children somewhat cold in their attitude and feeling toward others. He testified that Gloria's intentions and feelings towards the children generate a lot of warmth and feeling. In his evaluation he found Gloria to have emotional qualities that certainly qualify her to be a good mother.

A hypothetical question put to Dr. Hart by counsel for Gloria without objection by counsel for Wesley was the following:

"Q. I would like for you to assume that the husband has had since April the temporary custody of the children and that he is a full time business man and that in his absence there would be hired by him a negro maid on partial days and a retired school teacher who had never married nor had children who relieved the maid during the balance of the day, and the evening; then I would like for you to also assume that Gloria's desire to have her children and to act as a full time mother towards them; assuming these two hypotheticals, do you have an opinion as to which environment would best serve the interests of the children?"

Upon inquiry Dr. Hart was further told to assume that the people mentioned in the question who were to care for the children were substantially emotionally normal. Dr. Hart answered that in his opinion based on his experience it was always better to raise children by the mother than by child care personnel.

A similar hypothetical question, based upon the facts in the record, was put to various other expert witnesses without objection by counsel for Wesley.

It may be argued Wesley's requested finding, paragraph No. 16(p), adopted by the trial court was sufficient to uphold the trial court's determination that it was in the best interest of the children to have them placed with their father. This finding reads:

"(p) Warren G. Phillips, M. D., a board certified psychiatrist and President of the Kansas Psychiatric Association, who examined the defendant at the request of the plaintiff *without the benefit of any background information other than two psychological tests which had previously been given to her* found that she had a passive aggressive personality disorder, but that he could not rule out a more malignant illness, which he defined as being a thought disorder or psychosis. He testified based upon hypothetical questions outlining some of the above facts that he felt that in October of 1969 she had a thought disorder which he diagnosed as being schizophrenia and that it would take two to three years of intensive therapy for her to possibly receive a cure of such thought disorder. He defined intensive therapy as seeing a psychiatrist at least once a week and possibly as often as five days a week during the period of time he felt necessary. He further stated that from her past history her prognosis was poor for a recovery. He further stated that he felt that her illness whether a thought or personality disorder was now in a state of remission because of her present environmental structure which does not include caring for a home or the children, but only living in an apartment by herself. He stated that under the present environmental structure and the remission of her illness she was apparently able to function fairly well, but that she still showed little, if any, affect. He further stated that the possibility of regression or reoccurrence of her prior symptoms was present if she was placed under any stress or any change in her environmental structure." (Emphasis added.)

It is apparent the trial court did not give credence to the testimony of Dr. Phillips who diagnosed Gloria's mental illness as being of the schizophrenic type, which would take two to three years of intensive therapy for her to possibly receive a cure. If Dr. Phillips' diagnosis is correct, Gloria was mentally ill at all times material to this litigation and the trial court could not have granted Wesley a divorce (*Crosby v. Crosby*, 186 Kan. 420, 350 P. 2d 796). Where the trial court has rejected the testimony of a witness on the issue of divorce, as here, this court on appeal would not be warranted in giving credence to a finding of the trial court based upon such testimony to uphold an award of child custody.

Furthermore, Dr. Phillips' opinion testimony was of a speculative or conjectural nature based upon possibility and not probability. After interviewing Gloria, Dr. Phillips concluded she was functioning reasonably well, but in a very passive-aggressive manner. He then added that there *might* be a more malignant process underneath which under stress *might* come out. He further hedged his opinion testimony by saying, "*If* my diagnosis and my opinion is correct, based upon the present *assumed* behavior, then Mrs. St. Clair probably should not have custody of the children." (Emphasis added.) Had an objection been directed to such conjectural opinion testimony, it could not have been admitted into evidence. (*Myers v. Shell Petroleum Corp.*, 153 Kan. 287, 110 P. 2d 810; *Packer v. Fairmont Creamery Co.*, 158 Kan. 580, 149 P. 2d 629; *Rowe v. Maule Drug Co.*, 196 Kan. 489, 413 P. 2d 104; and *Nunez v. Wilson*, 211 Kan. 443, 507 P. 2d 329, and authorities cited therein.)

The Supreme Court in the past has not hesitated to reverse an order of the trial court granting custody of children of tender years to the father where the trial court abused the exercise of its power of discretion. (*Adkison v. Adkison*, 206 Kan. 125, 476 P. 2d 216; *Jackson v. Jackson*, 181 Kan. 1, 309 P. 2d 705; *Hedding v. Inman*, 172 Kan. 567, 241 P. 2d 479; *Wilkinson v. Wilkinson*, 147 Kan. 485, 77 P. 2d 946; and *Lindbloom v. Lindbloom*, supra.)

Some of the utterances made by our court in the past relative to the rights of a mother to have custody of her infant children follow.

In an early case, *In re Bort, Petitioner*, &c., 25 Kan. 308, the court said:

"We understand the law to be, when the custody of children is the question, that the best interest of the children is the paramount fact. Rights of father and mother sink into insignificance before that . . .

". . . We see no reason to doubt that Mrs. Bort is a loving mother, devoted and faithful to her little ones. Her conduct since she left her husband, and since the divorce, seems to have been without reproach. Whatever may be her faults, it is evident that these children will receive only the kindest care if left in their present home. They are of that tender age when they need a mother's care. No stranger, however kind, can fill her place. We may not ignore these universal laws of our nature, *and they compel us to place these children where they will be within the reach of a mother's love and care.*" (Emphasis added.) (pp. 309, 310, 311.)

*Wilkinson v. Wilkinson,* supra, relied upon *In re Bort* and quoted it with approval.

In *Hedding v. Inman,* the Supreme Court reversed an order of the trial court granting exclusive custody of an eight year old girl to the father, where he was away from home all day and left the child with his mother. There the court expressed concern about the child's welfare. In applying the applicable rule the court stated:

"It is clear the trial court properly deemed the best interests of Susan to be the paramount issue. Such is clearly the law. (See *Prier v. Lancaster,* 169 Kan. 368, 219 P. 2d 358.) The trouble about that rule is it is easy to state but difficult to apply. Every case has some new feature. One cannot read the reports of this court without being convinced that justices from the time of the revered Justice Brewer down to now have felt their inadequacy. Such cases have been submitted to us many times. We can only do our best to look beyond the personalities of the older persons concerned to the welfare of the child." (p. 572.)

There the court granted the mother, Georgia Mae, custody of the child from September 1st to June 1st of each year. In doing so the court said:

"One thing Georgia Mae can give her, which no one else can—that is a mother's love. Indeed on the witness stand that seemed to be uppermost in her mind. Who can say, perhaps were each parent can clothe, feed and provide adequate shelter for her equally, the mother love item should tip the scales? We have come to that conclusion." (p. 573.)

The record presently under consideration is replete with evidence disclosing the warmth of the mother and her love for her children. Her testimony covers 50 pages in the record. It is coherent and gives every indication she is a well adjusted women. The following testimony indicates her version of the source of marital difficulty, and it also indicates the love she has for her children:

". . . After the marriage, we lived about a month on the Plaza, my roommates having moved out. We then bought a house at 2915 West 93rd St., in Leawood, Kansas and this was a two bedroom dwelling with a study, living room, dining room, kitchen and two baths, and it was in a neighborhood

dominated by retired people and very few children. Following the marriage I discontinued my work at the bank.

"As a housewife I cleaned, cooked, ironed and we got along fine. Wes was working at the Southgate Bank. In the beginning we communicated freely and then I began to observe a change as each year Wes became busier and spent more time with the business and less time at home. We both owned the house on 93rd Street. Our social life consisted of entertaining business customers and associates. Wes would work in the daytime then would spend his evenings with business associates and would spend his weekend golfing with his business friends. In the evening after dinner, he would spend his time reading bank literature in the study. I would try to show my love and affection for him by putting my arms around him and he would say he had to read and for me to go work on the dishes. The atmosphere had grown cold before the birth of our first child and we had ceased to talk together and he had ceased to include me in his activities even though we did travel to such places as Miami, New York, Los Angeles, San Francisco, Colorado and New Orleans.

"Our first child was born on June 9th, 1962 and his name is John Wesley, Jr. Our second child was born on June 25th, 1966 and his name is Kenneth William. My feelings for my children is one of love and I want my children to be with me more than anything else in the world. I have had this love for them before they were born and it was Wes, not me, who used contraceptives. I love and want my children to be with me and from the time I became pregnant I began preparing for their birth by going to Dr. O'Connell. I went as often as he prescribed and I kept healthy with exercise, proper food, milk, vitamins and I did not smoke or drink. I delivered J. Wes in 14 hours and Kenneth in less time. Never in my life have I ever said 'How will I do it, I can't take care of one, how will I be able to take care of another'. I have shown love for my children in millions of ways in the way in which I cared for them. . . ."

Gloria identified an exhibit which was introduced in evidence as an example of the cleanliness afforded her children by "Their father's hired help, i. e., dirty ears, fingernails and hair."

The clutter of laundry in the house was explained by Gloria in the following testimony:

". . . I trained the children to have manners even though Wes would not back me on dicipline. I toilet trained them in a relaxed manner by praise and did not criticize their mistakes. *The children had clean clothes despite the fact that we had no washer or dryer in the nine years that we lived at 93rd Street because my husband said he wanted to send the laundry out like his parents who likewise didn't have a washer or dryer.* The laundry would be taken by Sydney, Wes or me. *The bathtub on 93rd Street was used as a tub, as a place to wash clothes and as a laundry storage for soiled clothes.* . . ." (Emphasis added.)

Gloria further testified concerning the children:

". . . The boys were not thumbsuckers, bedwetters, or stutterers and

they do not lie or cheat. If the court will give me my children I will give to them a fulltime loving mother 24 hours a day, one who has very much loved and cared for them. I want my children back. From birth to the present time the children have responded to me by hugging, kissing, by putting their arms around me and wanting me to take their hand."

Gloria described Wesley's plan to push her out of the home:

"The children always asked for my help and never sought the help of Lilly Eldridge from September, 1969, to April, 1970. My husband brought in Mary Frances Kearney as his bank assistant and gave her a key to our house. He hired a maid and we went from a maid once a week to five days per week. *His administrative assistant took over making cocktails in our house* to taking the children to a cat show to bandaging their skinned knees and I recall that *my husband would say that it was bank policy rather than fire an employee to take away his duties at the bank until he had finally nothing to do and [he] would quit. Like such an employee, by April of 1970, there was nothing to do.* My husband would be gone two or three nights a week from home and as his bank was growing, he moved to president and when he was home, he was busy reading bank literature. He would be gone a half a dozen trips a year for three or four days and I would be in charge of the children. He seldom came home for dinner and the boys and I would eat alone and would be in bed when he would arrive home. I was not allowed to have money, only credit cards. I had a $200.00 account at Ranchmart but he would not reimburse me when I spent money for groceries so I charged everything.

"After the separation I was not allowed any credit on the accounts held by my husband and I was unable to prepare a defense for myself without borrowing money from the Johnson County National Bank. During our marriage Wes told or demanded that I do certain things and never would consult with me. . . . I have noted that since April there has been a great show of activity by my husband with the children in that they are seen at different places and that he buys them such things as basketballs, swings, sand boxes, and bikes, whereas before April he was always too busy.

"I was not allowed in the house on 101st Street. The maid or Mary Frances Kearney made it difficult for me to get to see my sick children. On April 3rd, my husband put a silent number in at the house and has just recently put in answering service. From the very beginning visitation was difficult and Wes would create conflicts. At no time was I ever advised of unlimited visitation. On May 18th, 1970, I moved into an apartment which I alone had selected to be near my children and away from the Oak Hall address arranged for me by Wes. *I purchased all of the furniture by household loans and chose all my own things.* . . . I have had conversations with my husband in which he would say to me that his first interest was his business and his accomplishments and that his second interest was his children. He seeks wealth, power and moves in circles of high officials, Ellsworth, Avery, senators and Congressman Winn. The children are transported in a Cadillac limousine to the baseball game and to the golf tournament. The children's clothing had to be of the latest style—Nieman Marcus in Dallas, or Woolf Brothers. For the past three years at least he has had license plate #4 and the Johnson County officials

have the first three. He transferred the initials J. W. S. from his Cadillac to a Cadillac limousine. He is a perfectionist in his dress and sends pictures and articles about himself to magazines and newspapers. He never did allow me to know anything about his business or his assets. . . ."

Concerning her hospitalization in October Gloria testified:

". . . I did go into Menorah Hospital in October, 1969 and I was discharged in November, 1969. I was improved. Everything had been moved to the new house by then and before I left the bathtub did contain soiled items, including clothing, but I have no knowledge of any dead red roses. After my release from the hospital I would purchase the food for our family who were now living at 101st Street. There was no trash at this house. I recall I took Kenneth to a Thanksgiving program and then in December, 1969, Wes said that he had fallen out of love and an appointment had been made to talk to Dr. Terrill in January.

"In January, 1970, we agreed to stay together. I kept trying and I had no thought of divorce. We lived together intimately as husband and wife after we had made up. . . . From November, 1969 to January, 1970, Wes would accuse me of being a backslider and he would tell me that I should go back to the hospital. I recall in January, 1970, that he went on a two week vacation by himself and in February of 1970, he went to New York and during that time I was in full charge of the children. . . ."

A number of lay witnesses testified concerning Gloria's school activities. Donna Babcock became acquainted with Gloria in the fall of 1967 when her first child was in kindergarten. Since that time she has seen Gloria many times at school functions concerning her children.

Mary Ann Rippee testified she became acquainted with Gloria at the mothers' meetings at Barstow Valentine's Day party in 1970, and was at various meetings throughout the year. She also said Gloria was chairman of Halloween, preschool and third grade party; that she knew Gloria from approximately two years ago. She described Gloria's oldest child as being clean at all times and immaculate in his dress.

Harold Malone knew Gloria as a volunteer worker in the Headstart Program. He testified the children take to Gloria very well and that he noted she was always on time, or if not, she called if she was going to be late.

Mary Jean Londeen a candidate for a Masters Degree at Kansas University in the field of education for mentally retarded children worked in Johnson County in the summer of 1970 and became acquainted with Gloria who was helping in the program for the mentally retarded. She testified that Gloria had a great deal of feeling for children and she found her to be a patient, understanding

and kind person. She testified Gloria had rapport with the children and they responded to her and she to them.

For the reasons heretofore stated, and under all of the facts and circumstances presented by the voluminous record, we hold the trial court abused the exercise of its power of discretion in awarding custody of the children to the father.

Gloria contends in her brief on appeal the trial court committed reversible error in granting a divorce to Wesley from her on the grounds of gross neglect of duty, since the evidence and the findings made by the trial court indicate the grounds upon which the court based its decree of divorce were the product of a mental illness.

Although this assignment of error is among the last asserted by Gloria in her brief for a reversal, chronologically it merits disposition at this point.

In the trial court Gloria, among her requested findings, asked that Wesley be granted a divorce. Her requested finding No. 13 reads in part:

"The plaintiff has generally performed the duties devolving upon him as the husband of the defendant, but that the defendant, in disregard of her marriage vows and obligations has committed indignities to the marital relation. That plaintiff should be granted à decree of divorce from the defendant for her fault on the ground of indignities. . . ."

In her requested conclusions Gloria asked that Wesley be granted a decree of divorce from her on his petition on the ground of incompatibility, and that her cross-petition be denied.

The net result is that Gloria is taking a position on appeal inconsistent with her position taken in the trial court. Nothing in the record, however, suggests collusion between the parties to obtain a divorce. In her cross-petition Gloria requested a divorce from Wesley on grounds of incompatibility.

As of January, 1970, the record establishes condonation by the parties of prior conduct giving rise to the grounds for divorce alleged, if in fact grounds for divorce existed between the parties prior thereto. (*Goetz v. Goetz,* 180 Kan. 569, 576, 306 P. 2d 167, and cases cited therein.) Thereafter the parties continued to live in the same house under circumstances indicating that harmony in the marriage relationship was impossible. Suffice it to say, the record discloses sufficient evidence of conduct in the marriage relationship after January, 1970, giving rise to a ground for divorce, when Gloria could no longer be characterized as mentally ill, to sustain the order granting a divorce, and to distinguish it from

the facts in *Lindblom v. Lindbloom,* supra, and *Crosby v. Crosby,* 186 Kan. supra.

An extended discussion on this point is not required. In view of the position taken by Gloria in the trial court, we do not feel warranted in disturbing the order of the trial court granting Wesley a divorce.

The next point asserted by Gloria on appeal is that the trial court erred in making an inequitable division of the property accumulated by the parties since the marriage, and in depriving her of the homestead.

It is clear from the record the trial court set aside the postnuptial agreement entered into between the parties because Gloria was not afforded independent legal advice, and she was not fully apprised of the nature and extent of the property or its value. Nevertheless, the trial court in making an ultimate division of the property and in awarding alimony, after hearing all the evidence in the case, made a division of the property and awarded alimony in almost all respects identical to the terms set forth in the postnuptial agreement which it had previously set aside.

The trial court, after finding the parties had accumulated property which had a net worth of $132,972.64, made a division of the property whereby Gloria received the automobile which she had previously been driving, a suitcase of clothes which Wesley's administrative assistant had delivered to the Missouri apartment at the inception of the proceeding and $20,000.00 as a lump sum cash settlement. It also decreed alimony of $1,000.00 per month until death or remarriage. All of the rest of the property, homestead, securities, investments, household goods, clothes and bank accounts were set aside to Wesley.

Counsel for Gloria in her brief suggests the mathematical discrepancy between the two segments of the marital property is so great that it should shock the conscience of the court, and that the situation is made even worse by the refusal of the trial court to consider Gloria's Exhibit S.

It may be said there is evidence in the record to support the trial court's finding as to the net worth of the properties accumulated by the parties during the marriage.

Under K. S. A. 1972 Supp. 60-1610 (*b*) the trial court is directed to divide the property of the parties in a just and reasonable manner. Thus, the subject is largely entrusted to the discretion of the trial

court. (*Small v. Small*, 207 Kan. 506, 485 P. 2d 1365.) Similarly in K. S. A. 1972 Supp. 60-1610 (*c*) the trial court is authorized to award an allowance for future support to a party denominated as alimony, in such amount as the court shall find to be fair, just and equitable under all of the circumstances.

While the division of the property is largely in the discretion of the trial court, such discretion cannot be used arbitrarily. The discretion vested in the trial court must be exercised in whole-hearted good faith and be guided by the statutes, not by the court's private opinion of what the statute ought to be. Where the exercise of discretion is arbitrary and not judicial, and the judgment is inequitable, it will be set aside. (*Longo v. Longo*, 193 Kan. 386, 395 P. 2d 302, and cases cited therein.)

Assuming the net worth of the properties accumulated by the parties to be $132,973.64, as found by the trial court, the grossly inequitable division of such property by the trial court, under all of the facts and circumstances presented by the record, indicates arbitrary action on the part of the trial court in the exercise of its power of discretion.

The alimony award, upon which counsel for Wesley relies to justify the property division, is founded upon Wesley's earning capacity and the needs of his wife for maintenance in the station of life to which she has become accustomed. The alimony payments were made conditional, as authorized by 60-1610(*c*), *supra,* and the court may modify the amounts or other conditions for the payment of any portion of the alimony originally awarded that have not already become due.

Accordingly, the order of the trial court making a division of the properties of the parties must be set aside.

The trial court awarded attorney's fees to Gloria's attorney in the amount of $12,500.00 pursuant to K. S. A. 1972 Supp. 60-1610(*f*). Gloria presented evidence that the reasonable value of her attorney's services in the trial court were from between $18,000.00 to $22,-000.00. She contends the allowance made is contrary to the un-contradicted evidence.

The allowance of fees to the wife's attorney for the efficient preparation of her case rests largely in the discretion of the trial court. While the trial judge should give due consideration to the opinions of the expert witnesses as to the value of legal services, he is not controlled by such evidence, since the trial judge is himself an

expert on this subject and may apply his own knowledge and professional experience in determining the value of legal services. (*Wolf v. Mutual Benefit Health & Accident Association,* 188 Kan. 694, 366 P. 2d 219; *Brooker v. Brooker,* 199 Kan. 783, 433 P. 2d 363; and *Small v. Small,* 207 Kan. 506, 485 P. 2d 1365.)

We cannot say the trial court erred in its order making an allowance for attorney's fees.

Gloria's assertion that the trial court erred in failing to grant her motion for change of venue is without merit. A matter such as this lies within the discretion of the trial court and it has not been shown that the trial court erred in this respect. Gloria made no motion that the trial judge disqualify himself prior to trial. Having failed to do so, she cannot now invoke the jurisdiction of the Supreme Court for a reversal on that point.

Other points asserted by the appellant in her brief have been carefully considered and are found to be without sufficient merit to warrant further discussion. (K. S. A. 60-2105.)

Based upon the foregoing the judgment of the lower court is affirmed in part, modified and reversed in part as follows:

1. The order of the trial court granting a decree of divorce to Wesley from Gloria is affirmed.

2. The order of the trial court granting Wesley the care, custody and control of the minor children of the parties is reversed. Gloria is granted the care, custody and control of the minor children of the parties free of harassment, interference or molestation by Wesley or any nominee or private investigator designated by Wesley or on his behalf. This order however is subject to reasonable visitation rights of Wesley to be fixed by the trial court, after proper notice and hearing. In the best interest and welfare of the minor children this order also shall be subject to the further order of the trial court upon proper showing of a change of circumstances.

Pursuant to K. S. A. 1972 Supp. 60-1610(*a*) the trial court is directed, after proper notice and hearing, to make provisions for the support and education of the minor children placed in the custody of Gloria. The order shall direct Wesley to make child support payments to Gloria as are reasonable under the circumstances and commensurate with the station in life to which the children are accustomed.

3. The order of the trial court making a division of property is affirmed insofar as it sets aside the postnuptial agreement of the paties, but it is modified in all other respects as follows:

As a division of the property of the parties, the following property is set aside to Gloria as her separate property, free and clear of any rights, title or interest of Wesley:

(1) The Cadillac automobile used by Gloria and in her possession on the date this action was filed.

(2) All household furniture in her present apartment.

(3) All clothing and personal effects owned by Gloria at the time this divorce action was filed.

(4) All personal property in the home occupied by the parties at the time this divorce action was filed, except the furniture, Wesley's personal library and Wesley's wearing apparel.

(5) The sum of $65,000.00 to be paid in cash as follows: $20,000.00 shall be paid when this decree shall become final and the balance at the rate of $1,000.00 per month commencing thirty days after the decree becomes final and continuing until the total sum of $65,000.00 has been paid in full.

The remaining property of the parties is set aside to Wesley as his separate property, free and clear of any right, title or interest of Gloria, and Wesley shall assume and pay any liabilities thereon and save Gloria harmless from any obligation thereof.

4. The order of the trial court awarding future support denominated as alimony in the sum of $1,000.00 per month to Gloria, to be terminated upon the death or remarriage of Gloria is affirmed.

5. The order of the trial court requiring Wesley to keep and maintain the policies of life insurance on his life, with Gloria designated as principal beneficiary thereunder, as security for the future support of Gloria as herein ordered, terminating in the event of the death or remarriage of Gloria, and to supply Gloria with copies of said policies upon reasonable demand, is affirmed as modified.

6. The order of the trial court requiring Wesley to keep and maintain hospitalization and medical care insurance on Gloria and the minor children, and to supply Gloria with a copy of said policy upon reasonable demand is affirmed.

7. The order of the trial court allowing Mr. James D. Howell, Jr., attorney for Gloria, a professional fee of $12,500.00 of which $2,500.00 has already been paid, and granting Gloria a judgment against Wesley for such sum is affirmed.

8. The trial court's finding that the expenses incurred by the parties in this litigation should be paid by Wesley is affirmed.

Since the exact amount has not previously been determined, the trial court is directed to conduct a hearing, after proper notice to the parties, to determine all expenses incurred by the parties and to enter an appropriate order directing Wesley to pay such expenses.

In all other respects the order of the trial court is affirmed.

PRAGER, J., dissenting: I respectfully dissent from that portion of the opinion which reverses the district court in its award of custody of the two minor children to the father. In awarding custody to the mother in this case we have departed from our customary role as an appellate court and have assumed the role of a trial judge by weighing testimony and substituting our judgment for that of the trial court. The evidence at the trial disclosed a clear-cut issue of fact as to the capacity of Mrs. St. Clair to provide for the emotional development of the children. There was much testimony as to bizarre conduct on the part of Mrs. St. Clair over an extended period of time. In addition, two qualified physicians testified that in their best judgment it would not be conducive to the good emotional development of the children for Mrs. St. Clair to have their custody. I refer specifically to the testimony of Dr. Frank O'Connell who delivered both of the St. Clair children and was the family doctor of the St. Clairs for a number of years. At the trial Dr. O'Connell testified as to Mrs. St. Clair's emotional problems and concluded without reservations that Mrs. St. Clair's taking care of the children would not be conducive to their good emotional development. In addition, there was the testimony of Dr. Warren L. Phillips, president of the Kansas Psychiatric Association. At the trial in December 1970 he testified that he had interviewed Mrs. St. Clair as recently as three months before the trial in September in three separate interviews. He was of the opinion that in September 1970 she was functioning as an obsessive-compulsive personality and that in his opinion it would not be for the best intrests of the children for Mrs. St. Clair to have their custody.

The trial court had the burden of resolving one of its most difficult problems, to determine custody of minor children. The trial court had the highly important advantage over this court, which we have so often been compelled to recognize and state, of seeing the parties, observing their demeanor, assessing their character, weighing their testimony and considering the best interests of the children under all the circumstances. We have only the cold narrative of printed

facts before us. It alone cannot possibly adequately portray the whole picture as witnessed by an able and discerning trial judge, the trier of the facts. (*Moloney v. Moloney*, 167 Kan. 444, 448, 206 P. 2d 1076.)

By reversing the order of custody we, of necessity, hold that notwithstanding the highly important advantage the trial court had over this court that court acted arbitrarily and not in the exercise of sound judicial discretion. In my judgment a careful analysis and review of the entire record does not permit us to reach that conclusion.

For these reasons I would affirm the judgment of the trial court awarding custody of the two boys to their father.

FONTRON and FROMME, JJ., join in the foregoing dissenting opinion.